## BANK OF VIRGINIA *v.* ADAMS.

To induce a Court of Equity to refuse its aid to a suitor, it is not sufficient that he may have *some* remedy at law.

An existing remedy at law, to induce equity to decline the exercise of its jurisdiction in favour of a suitor, must be an adequate and complete one. Where, from the nature and complications of a given case, its justice can best be reached by the means generally employed by a Court of Equity, this tribunal will take cognisance of the suit.

And the general rule is, that where a full, perfect, and complete remedy cannot be afforded at law, equity extends its jurisdiction in the furtherance of justice.

In the case of a corporation located within the state, and having the capital stock subscribed to by stockholders applicable to the objects of the association, a Court exercising equity jurisdiction can compel the stockholders to pay their just creditors, when the debt is established, in proportion to the amount of stock subscribed by them respectively, and remaining unpaid.

This power will be exercised when the directors of the corporation neglect and refuse to call in the unpaid instalments, and to apply it to the debts of the corporation.

A bill may be supported against individual corporators, on a contract with the company for the discovery and application of the funds of the corporation in their hands.

The capital stock of an incorporated company, remaining unpaid by its stockholders, is a trust fund, applicable to the payment of its debts. It is such a trust as can and will be executed by a Court of Equity.

A Court of Chancery acts primarily and properly on the person, and at most collaterally on the thing. If the person be within the jurisdiction of the Court, it will generally be exercised, although the subject of controversy be without. But this general rule has its exceptions.

To induce a Court of Chancery to interfere in causes of action arising in a foreign jurisdiction, it must be complete to administer the appropriate equity required by the case, and capable of giving effect to its decree.

Against a foreign corporation, a Court of Equity in Pennsylvania can exercise no jurisdiction to compel stockholders residing here to pay the stock subscribed to such corporation, on the application of a creditor of such company.

A corporation has no legal existence out of the boundaries of the sovereignty by which it was created. The official functions of the agents and officers of such a corporation do not follow them, so as to authorize the service of process upon the corporation.

A Court of Equity has no jurisdiction, because a *foreign corporation* is insolvent, or its officers neglect or refuse to perform their duty, to compel them to execute their functions. The remedy is in the sovereignty where the corporation was created, and not in another country.

THIS was a bill in equity, filed by the "Bank of Virginia" against Thomas Adams and thirty-three others, naming them, in which it was stated that the plaintiffs sued in behalf of themselves and all other creditors of the "Rappahannock Mining Company," who should come in and contribute to the expense of the suit; that

by an act of the legislature of Virginia, passed on the 6th of January, 1834, entitled, "An Act to incorporate the Rappahannock Mining Company," which was set out verbatim in the bill, certain persons therein named were incorporated under the name of the "Rappahannock Mining Company," and were authorized and empowered, for the purpose of mining, to raise and contribute among themselves and such other persons as should thereafter become associated with them, a capital sum of not less than $100,000, nor more than $500,000, to be divided into shares of $100 each. That after the passing of said Act, Thomas Adams and thirty-three other persons named in the bill as defendants, all of the city and county of Philadelphia, became associated for the purpose of mining, with the persons in the said Act named, and subscribed for the capital stock of said company, and became stockholders therein, and promised to pay to the said company $100 for every share of stock so subscribed for by them; and severally subscribed for the number of shares stated in the bill, and respectively promised to pay the sums of money specifically stated in the same. That said persons, with divers others as yet unknown to the plaintiffs, subscribed and promised to pay the sum of $133,300 to the capital stock of said company.

It was also averred that said company, being duly organized, commenced and prosecuted their mining operations. That to raise funds for the purpose of mining, said company became indebted to the plaintiffs in the sum of $3000, by a bill of exchange drawn by the superintendent and agent, endorsed by the assistant superintendent, and accepted by the treasurer of said company, at Philadelphia, for and on behalf of the said company, which bill of exchange was duly protested for non-payment, and, with interest thereon, yet remains wholly due and unpaid to the plaintiffs. That the capital stock of said company was established and designed, held forth, and represented to be a fund for the payment of the debts of said company; and the plaintiffs gave credit to said company on the faith of the capital stock being and remaining a fund liable for and adequate to the payment of said bill of exchange. That the plaintiffs are advised that the capital stock of said company was and is a fund appropriated by the act of incorporation, and by law, to the payment of the just debts and liabilities of the company; and that the said Adams and the other subscribers in the bill named, in subscribing for the number of shares and sums of money therein mentioned, became severally liable to pay the several amounts in discharge of the debts of the company, and are bound in justice or

equity for so much as remains unpaid of the sums subscribed as aforesaid. Yet, that the said subscribers, though thus bound, have not fulfilled their several undertakings, and have only paid a small portion, to wit, forty per cent. upon each share of the capital stock of said company subscribed for by them, and the remainder thereof now remains due and unpaid; and the President and Directors of said company, though authorized by the act of incorporation aforesaid to call in and enforce the payment of unpaid capital, or so much thereof as may be required for the payment of the debts of said company, yet refuse to enforce the payment of the said unpaid capital, according to the provisions of the act of incorporation; by means whereof the Rappahannock Mining Company are without any funds for the payment of their just debts to the plaintiffs and others.

It was further stated in the bill that the president and treasurer, and the directors of said company, reside in the city of Philadelphia, out of the limits of the commonwealth of Virginia; and that there is no person within the said commonwealth, upon whom legal process against said company can be legally served; and that the plaintiffs were thereby wholly prevented from recovering a judgment at law against the company. That the plaintiffs are advised that the sums of money remaining unpaid on the several shares of stock are, in justice and equity, now a fund in trust in the hands of the subscribers for the payment of the just debts of the company. That the said subscribers being so in possession of said funds in trust as aforesaid, the plaintiffs requested them to pay and satisfy their demand. But that the said subscribers, combining and confederating with one another, and with divers others at present unknown to the plaintiffs, whose names, when discovered, it was prayed might be inserted to charge them as parties, refused to comply with said request. Interrogatories were then propounded, and the bill prayed that accounts might be taken, under the direction of the Court, of what is due to the plaintiffs for principal and interest on their demand, and of the sums remaining due and unpaid on the shares of the capital stock of said company subscribed for by the defendants. That the demand of plaintiffs might be decreed to be paid out of the sums so remaining due and unpaid as aforesaid; and a prayer for general relief.

The defendants, most of them, demurred to the bill, and assigned as causes of demurrer;

1. That there is no equity in the bill.
2. That the Rappahanock Mining Company is a necessary party.

3. That there are other necessary parties who are alleged to have subscribed to the capital stock of said company, and that the plaintiffs do not ask that they may charge them, when discovered, with apt words, as parties to the bill.

4. That the Court has not jurisdiction of the case.

In support of the plaintiffs' case, a printed argument was submitted by *R. C. L. Moncure*, Esq., of Virginia, with whom was *J. Randall*, Esq. And to sustain the demurrer, a printed argument was submitted by *C. Fallon* and *G. M. Dallas*, Esqs.

It was said by the plaintiffs' counsel that two leading propositions were submitted for the consideration of the Court: 1st, Whether the plaintiffs are entitled to the equitable relief which they claim against the defendants? and if so, 2dly, Whether such relief can be administered by this Court?

In support of the first proposition, it was contended that upon general principles, as well as according to the legislative intention, the capital stock of incorporated companies is deemed a trust fund for the payment of the debts of the corporation; so that the creditors have a lien on, or right of priority of payment out of such capital stock, in preference to any of the stockholders in the corporation: from which it would follow, that if the capital stock should be divided, leaving any debts unpaid, every stockholder receiving his share of the capital stock, would in equity be liable, *pro rata*, to contribute to the discharge of such debts out of the funds in his own hands.

That if the directors of the corporation, in violation of their duty, fail to make calls upon the stockholders, or to enforce them when made, and the corporation is without funds for the payment of its debts, a Court of Equity will compel the directors to perform their duty, or afford relief to the creditors by a decree against the stockholders. And lastly, that this is a remedy which can be obtained in equity only.

It was said these are plain principles of law, as well as common sense, and were fully sustained by Wood *v.* Dumme, 3 Mason, 308, 2 Story's Eq. § 1252, and by this writer laid down as elementary principles.

The following authorities were also relied upon: Vase *v.* Grand, 15 Mass. 505; Spear *v.* Grant, 16 Mass. 9; Slee *v.* Brown, 19 Johns. 456; Salmon *v.* The Hamborough Company, 1 Cases in Ch. 204; 1 Kyd. on Corp. 273; Briggs *v.* Penniman, 8 Con. 387; Hume

68

*v.* Winyaw & Wando Canal Co., 5 American Law Magazine, p. 92. In this case no specific fund was set apart, or provided as corporate capital, either in the charter or the organization of the corporators; and as the means of supplying it, the company entered into a resolution that it should be raised by assessment on the individual members, in proportion to the number of shares owned by each. The company imposed an assessment on its members; but some of them neglected or refused to pay the assessment, and the company neglected to enforce such payment. The corporation being without funds, the plaintiff, a creditor, exhibited his bill in equity against the delinquent members; all but one admitted the debt, and expressed a willingness to pay their respective proportions; one demurred; and on the argument of the demurrer, the broad ground was taken, that the individual members of a corporation are never liable for acts or debts of the corporation, unless the act creating it makes them so. But Chancellor Dessaussure overruled the demurrer, and gave relief against the individual members; and his decree was affirmed by the Court of Appeals of South Carolina. Another authority was cited to this point, Ward *v.* The Griswoldville Man. Co. 16 Conn. Reps. 593. These cases, say the learned counsel, conclusively show that the plaintiffs are entitled to the equitable relief which they claim.

The present case is much stronger for the plaintiffs than most of those cited; whether we look to the general principles of equity, or the particular circumstances of each case.

The case of Riddle *v.* Manderville, 5 Cranch, 322, is an illustration of the principle: 2 Story, § 1250; Harman *v.* Tappenden, 1 East, 555.

To sustain the second proposition, whether such relief can be administered by this Court, it was contended that this Court has at least as much jurisdiction to grant the relief prayed for, as if it were sitting in Virginia, or the company were incorporated by the legislature of Pennsylvania; in either of which cases the relief would be granted. The grounds on which the relief is claimed, are, that the corporation is indebted to the plaintiffs, has no funds to pay its debts, and is not in a condition to be sued; and the defendants subscribed for stock, and engaged to pay the amount of their subscriptions, but have not done so; that the corporation has power under the charter, and is in duty bound, to call in the capital, and pay its debts, but has neglected and refused to do so; and that the capital is a trust fund, devoted by law and the charter to the payment of the debts of the corporation, which were created on the

credit of such capital; and that the plaintiffs are without remedy if they cannot follow this trust fund into the hands of the defendants, and subject it to the payment of their debts.

To sustain this position was cited Henry v. Richards, 1 Mason, 281; Desesbats v. Berquier, 1 Binn. 337; Greer v. O'Daniel, Ib. 349, note; Tunstall v. Pallard, 11 Leigh, 1.

A Court of Equity, as has been often said, *git in personam.* If the person be within the jurisdiction of the Court, such jurisdiction will be exercised, even though the subject in controversy be without, provided the Court can give its decrees: 2 Story's Eq. §§ 899, 960; 2 Sory, §§ 1184, 1186, 1290.

And even though the subject affected be land; unless, indeed, the relief which is asked is of such a nature that the Court is incapable of administering it: 2 Story's Eq. § 1292; 2 Com. Dig. Chan. 3 X.; 4 Watts, 27; 1 Vern. 75; Arglasse v. Muschamp, Ib. 419; 1 Vesey, Sr. 444; Penn v. Lord Baltimore, 1 Hen. & Munf. 2; 2 Des. 583; Massie v. Watts, 6 Cranch, 160; 16 John. 6; 16 Pick. 286; 13 Peters, 520.

For the defendants it was contended that the bill does not allege that the company are insolvent or without funds to pay their debts, nor are they made parties to the bill. That there were three causes for demurrer: 1st, want of equity; 2d, a want of parties; 3d, a want of jurisdiction in the Court

As to the want of equity: it has been argued for the plaintiffs that the capital stock of incorporated companies is a trust fund for the payment of the debts of the corporation, and may be followed by the creditors into the hands of the subscribers. But, assuming for the present the correctness of this position, the plaintiffs cannot take advantage of it in the present case. If unpaid instalments constitute a trust fund, then the company, or the directors in whom the management of the company is vested, are the trustees for the collection and distribution of it; and before a creditor can reach it, he must show neglect on the part of the trustee and insolvency of the corporation; that neither insolvency of the corporation is averred in the bill, nor is default of the directors sufficiently set forth. To sustain this view, Wood v. Dumme, 2 Pick. 292, was relied upon. It was then concluded that plaintiffs' bill showed no equity, by not showing that the company is insolvent—in not showing that the directors are in default, or that the company is dissolved.

In not showing that the capital had been actually paid in and thus a trust created; and in not showing that the plaintiff is a

creditor of the corporation ; and for this ground the bill ought to be dismissed.

2d. That the want of parties was fatal.

That all parties interested must be made parties to a bill, is a principle too familiar to cite authorities to support; and it is equally clear, that all who may be affected, or who are necessarily affected by the decree, are interested, and must be made parties to the bill. That if these principles were applied to this case, the demurrer must be sustained. The plaintiffs' bill is predicated on the existence of a debt due to them by the corporation, and before a final decree can be made, the Court must decide whether such debt is really due.

There may be defences to the suit which none but the corporation know of, or can take. It would be an anomaly for a Court to determine that a debt is due by a party not before them, or without giving that party an opportunity to defend. The Court cannot decree this application of the property of the company to the discharge of a claim, the liability for which is neither admitted by the debtor, nor determined by the decree of the Court.

It was necessary to make the corporation a party to the bill, in order that the Court might have those who could legally sue before them.

It was also further contended, in support of the last ground of demurrer, that the Court had no jurisdiction in the case, because all the necessary parties have not in fact appeared to the action, and the Court has not the power to oblige them to appear. We have shown that the corporation is a necessary party.

A foreign corporation cannot be sued in this state : 1 Miles, 78 ; Dawson v. Campbell, 2 Miles, 170, 3 Law Journal, 58. A corporation created in Pennsylvania, is not suable out of the county where it has its principal office : 5 W. & S. 379. Therefore, a corporation chartered in Virginia, is not suable in any county in this state : 1 Amer. Law Magazine of January 1845, page 373, 96, 101.

The following opinion was delivered by

KING, President.—In considering this case, we will first regard it as if the bill had been filed by the creditors of a Pennsylvania corporation, containing all formal requisites, and having for its object the compelling the stockholders thereof to pay certain unsatisfied instalments of the capital stock unpaid by them, in order to raise the necessary means for the liquidation of corporation debts. Which instalments of capital stock had not been paid into the cor-

poration treasury, in consequence of the neglect or refusal of the directors of the company to make the necessary demand on the stockholders, and to enforce the same according to the provisions of the charter.

In such a state of things, would a Court of Equity entertain a bill filed by a creditor on behalf of himself and others, who might afterwards become parties thereto against such defaulting stockholders, in order to coerce the proportionate payment of such unpaid instalments, to be applied by the Court to the satisfaction of the creditors of the corporation according to the exigencies of their respective equities?

That creditors so circumstanced are not absolutely without a remedy at law, seems probable. Because, under such a state of things, a Court of law perhaps might afford some relief by *mandamus,* directed to the proper corporate officers, commanding them to do that which their duty and the requisitions of their charter required: to wit, to call in the unpaid instalments due by stockholders: The Queen *v.* The Victoria Park Company, 1 Ad. & Ell. N. S. 288; 41 Eng. Com. Law Rep. 544.

But to induce equity to refuse its aid to a suitor, it is not sufficient that he may have *some* remedy at law. An existing remedy at law, to induce equity to decline the exercise of its jurisdiction in favour of a suitor, must be an adequate and complete one. And where, from the nature and complications of a given case, its justice can best be reached by means of the flexible machinery of a Court of Equity, in short, where a full, perfect, and complete remedy cannot be afforded at law, equity extends its jurisdiction in furtherance of justice.

Of the superiority of the remedy in equity in cases like the present, through which payment of the fund applicable to the satisfaction of creditors may be required from the stockholders and distributed among all the former, according to the particular equities of each, it is submitted that no doubt can be entertained; even considering the question merely with regard to general convenience and practical usefulness. In point of authority, also, the doctrine is well sustained, that a bill may be supported against individual corporators, on a contract with the company, for the discovery and application of the funds of the corporation in their hands to the satisfaction of the contract. The question has arisen in Courts of Equity in two classes of cases. The one in which no defined capital was required by the charter; the other, where the charter provided for raising by subscription a certain amount of

2 Z

corporation capital. The earliest case of the first class is that of
Dr. Salmon *v.* The Hamburg Company, Chancery Cases, 206, 7,
(23 Char. 2); Viner's Abridgment, vol. 6, p. 310–11. In this
case the bill charged, that the company were incorporated by letters
patent, and had power to make by-laws and to assess rates upon
cloths (which was the commodity they dealt in), and by poll on
every member, to defray the necessary charge of the company;
that the company had imposed rates accordingly, namely 4s. 6d.
upon every white cloth exported, and divers others, and thereby
raised £8000 per annum towards the support of the common charge
of the company; that they *had thereby* got great credit, and bor-
rowed great sums of money by their common seal, and that particu-
larly the plaintiff lent £2000 upon that security. That the company
having no common stock, the plaintiff had no remedy at law for his
debt; that their usage had been to impose taxes, and levy actions
upon the members and their goods, to bear the charge and to pay
the debts of their company; and that they afterwards refused to
execute that power. The bill further complained against divers of
the members by name, that they had refused to meet and levy taxes,
pretending want of power to do so; whereas they had formerly ex-
ercised the power, and thereby gained credit, whereupon the plain-
tiff had lent them £2000, which was for the use and support of the
company, and so ought to be made good by them; and he prayed
to be relieved. The defendants demurred, and the Lord Chancel-
lor dismissed the bill. But on an appeal to the Lords, his decree
was reversed, and it was adjudged that the Chancery should issue
its process to compel an answer, or to take the bill *pro confesso;*
and should proceed to examine what the complainant's just debt
was, and should decree the said company to pay what was justly
due; and upon non-payment by the corporation, then the Lord
Chancellor should order and decree, that the Governor and assist-
ants of the company should proceed to make such assessment (or
leviation as it was called) on every member of the company, who
was to be contributor, as should be sufficient to satisfy the sum
decreed to be due, and to collect and levy the same, and pay it
over to the plaintiff; and on failure of such assessment, then and
from thenceforth *every person of the said company should* be made
liable to pay his proportion; and that such process should issue
against such member refusing or delaying to pay his proportion,
as is usual against persons charged by decree of the Court, for any
duty in their several capacities. The company and divers particu-

lar members thereof by name, in their natural capacities, were the defendants.

The doctrine of this case was applied by Chancellor Dessaussure, in 1828, in Hume v. The Winyaw and Wando Canal Company, and his decree was afterwards affirmed by the Court of Appeals of South Carolina, in 1828: American Law Journal for October 1844, p. 94. The Winyaw and Wando Canal Company was incorporated by the legislature of South Carolina, for the purpose of constructing a canal. No specific fund was set apart or provided for as a corporate capital, either in the charter or organization of the corporators; and as the means of supplying it, the company entered into a resolution that it should be raised by assessments, to be made on the individual members, in proportion to the number of shares owned by each, according to the contracts and exigencies of the work. The company imposed an assessment on its members, which it was supposed would cover the extent of their liabilities; but some of the members refused or neglected to pay the assessment, and the company neglected to enforce such payment. The corporation being without funds, the plaintiff brought his bill against certain members of the company, to compel the payment of a balance due him on a contract entered into by the company with him for work done under the contract. To this bill the plaintiffs demurred. This demurrer was overruled by Chancellor Dessaussure, after a learned and elaborate judgment, and a decree was entered, directing a Master to examine and report when the contract was made between the company and the plaintiff, and how much was justly due to him thereon; and that the company should lay before the Master a statement of their joint stock applicable to pay the said debt, and take measures to make the same productive, by sale or otherwise; and that on failure thereof, in whole or in part, each individual member be held liable to pay his quota or proportion of the deficiency; and that on any one failing to pay his proportion, the process of the Court should issue to enforce the payment thereof, *unless* the money should be raised within six months after the decree, by assessments made and collected by the company or its members.

In observing on the propriety of the exercise of equity jurisdiction in this case, Mr. Justice Johnson, who delivered the opinion of the Court of Appeals, remarks that " there is no common-law process of which I am aware, by which the complainant could compel the corporation to enforce this demand against Mr. Matthews (that is, for the amount of assessments which had been made on him as a

member of the corporation), or to compel the company to appropriate it, if raised, to the satisfaction of the complainant's demand. As a corporation, no proceeding at common law can operate upon them *in personam*, and they have no common property upon which the process of the Law Courts can act; and without the aid of the extraordinary power of a Court of Chancery, the complainant would be without a remedy.''

The case of Ward *v.* The Griswoldville Manufacturing Company, 16 Connecticut Reports, 593, was that of a corporation, in which the charter thereof provided for the creation of a capital stock, by subscription to shares in the ordinary manner.

The bill was filed by Ward and others on behalf of themselves, and on behalf of such other creditors of the Griswoldville Manufacturing Company as might elect to become parties to the bill, against Thomas Griswold and others, *stockholders of the corporation*, praying the Court to order and decree that the defendants pay into the hands of a receiver, an instalment of *sixty* per cent. upon their stock, or so much thereof as would be sufficient to pay the debts of the plaintiffs, and such other creditors as might elect to come in under the decree, to be applied *by such receiver to the discharge* of the same; *or*, that the Court would *require the directors* of said corporation *to call* in *such instalment* and apply the same to discharge such debts. The bill stated the incorporation of the company with a capital of $50,000, divisible into shares of $100 each; the authority of the directors to call in the subscriptions by instalments at their discretion; the fact that the company was duly organized and had commenced business, buying, manufacturing, and selling goods, &c.; that the corporation being indebted to the plaintiffs, they had commenced suits and obtained judgments against it, on which judgments executions had issued, and had been returned *nulla bona.* The bill then proceeded to name the president, directors, agent, and stockholders of the company, with the number of shares held by each, and averred that only *forty* per cent. of the capital stock had been paid into the corporation on each share, there being still due from each shareholder sixty per cent. on each share; that if said sixty per cent. were called and paid in, the said corporation would be able to discharge all its present indebtedness; but that the directors had neglected and refused theretofore so to do.

This bill was demurred to for want of equity, and because the plaintiffs had a remedy at law. The demurrer was, however, overruled; the Supreme Court of Connecticut holding that the amount of the shares subscribed for, and not merely the amount actually

paid in, constituted the capital stock of the company; that the unpaid balances of the shares were as much subject to the call of the directors as any debts due the company; that the directors were bound to make such call to the extent of the whole subscription of each stockholder, in order to satisfy the creditors of the corporation, if such whole subscription should be required for that purpose; that their neglect and refusal so to do, gave jurisdiction, under the circumstances disclosed in the bill, to equity, to grant the plaintiff relief; and that although the officers might at law be compelled to call in the unpaid subcriptions, yet that it was in the power of a Court of Chancery to do more ample and complete justice to the parties interested, than could possibly be done in a Court of law, and in all respects to afford the more appropriate remedy.

The doctrine of this case had been intimated previously in the cases of Vose *v.* Grant, 15 Mass. 505, and Spear *v.* Grant, 16 Mass. 9, in which the Supreme Court of Massachusetts, while it refused aid to the plaintiffs at common law, pointed out in what manner, and on what principle relief might be obtained in equity. The subsequent case of Wood and others *v.* Dummer and others, 3 Moran's Reports, 308, was a bill on the equity side of the Circuit Court of Massachusetts, filed by the plaintiffs as holders of the bank-notes of the Hallowell and Augusta Bank, against the defendants or stockholders, for the payment of the notes, upon the ground of an asserted fraudulent division of the capital stock of the bank by the stockholders. There was not the slightest proof of fraud, and the plaintiffs rested their case at the hearing, on the ground that the capital stock was a trust fund for the payment of the debts of the bank; and it was held " that the capital stock *was* a trust fund for the payment of the bank-notes, and might be followed into the hands of the stockholders; and that a bill in equity for such purpose might be maintained by some of the holders of the bank-notes, against some of the stockholders; the impossibility of bringing all before the Court being deemed sufficient to dispense with the ordinary rule, making all parties in interest parties to the suit.

The principle upon which both these classes of cases rest, is well expounded in the opinion of Judge Story, in this last case. "It appears," says he, "to me very clear upon general principles, as well as legislative intention, that the capital stock of banks is to be deemed a *pledge*, a *trust fund*, for the payment of the debts contracted by the bank. The public, as well as the legislature, have always supposed this to be a fund appropriated for such purpose.

The individual stockholders are not liable for the debts of the bank in their private capacities. The charter relieves them from personal responsibility, and substitutes the capital stock in its stead. Credit is universally given to this fund by the people, as the only means of repayment. Why otherwise is any capital stock required by our charters? If the stock may, the next day after it is paid in, be withdrawn by the stockholders without payment of the debts of the corporation, why is its amount so studiously provided for, and its payment by the stockholders so diligently required? To me it appears so plain, upon principles of law as well as common sense, that I cannot be brought into any doubt, that the charters of our banks make the capital stock a trust fund for the payment of all the debts of the corporation. The stockholders have no rights until the other creditors are satisfied.

"If I am right in this position, the principal difficulty in the case is overcome. If the capital stock is a trust fund, then it may be followed by the creditors into the hands of any person having notice of the trust attaching to it. As to stockholders, there can be no pretence to say that both in law and fact, they are not affected with the most ample notice of it."

On principle and authority, therefore, it seems alike clear, that in the case of a Pennsylvania corporation, located within our jurisdiction, and having a capital stock subscribed to by stockholders, applicable to the objects of the associated enterprise, we possess the jurisdiction to compel such stockholders to pay the just creditors of the corporation, duly established to be such, in proportion to the amount of stock subscribed to by them, respectively, and remaining unpaid; where the directors of such corporation neglect and refuse to call in such unpaid capital, and apply it to the payment of corporation debts, such a jurisdiction is essentially conservative of the rights of the public, which gives credit to the corporation on the faith of their ostensible capital, and to which such capital is pledged. Any doctrine short of this would leave the general public subject to be prayed upon by reckless speculators, who will be always found ready to enter into any enterprise in which the prospect of profit seems great, and the certainties of hazard little.

But can we properly entertain such a bill filed by creditors of a foreign corporation against a stockholder thereof, who has not paid up all his subscription to the capital stock of such corporation, and who may be found within our jurisdiction? It is on this branch of the case that the doubts of the Court have arisen. We do not

question but that the Bank of Virginia is as competent to maintain an action in the Courts of Pennsylvania as any citizen of or corporation created by the state of Pennsylvania. The cases of the Bank of Augusta *v.* Earl, 13 Peters, 520, and the judgment of this Court, confirmed by the Supreme Court, in The Kentucky Bank *v.* The Schuylkill Bank, ante, 226, settles that question beyond dispute. Nor is this case that of a creditor of the Rappahannock Mining Company, seeking to recover a debt due him by an attachment laid against a stockholder of the company, who has not paid up all the instalments on the stock held by him, treating such unpaid instalments as a debt due the company and attachable as such by a creditor thereof.

The grounds on which the compainants' case rests, is, that the capital stock of this company, unpaid by its stockholders, is a trust fund applicable to the payment of its debts; and that it is such a trust as can and will be executed by the Courts of any civilized forum in which the stockholder is found. Part of this proposition has already been shown to be true; to wit, that unpaid instalments of the capital stock of such a corporation as this, are, so to say, trust funds primarily pledged to the payment of corporation creditors. It is the extent to which the second branch of the proposition is sought to be carried in this case, that produces the difference between the Court and the learned advocates of the complainants.

Undoubtedly, a Court of Chancery acts primarily and properly on the person, and at most, collaterally only on the thing. If the person be within the jurisdiction of the Court, such jurisdiction will in general be exercised, although the subject of controversy be without. But that this rule, general as it is, has its exceptions, is shown by the case of Morris *v.* Remington, ante, page 389, where the subject is much discussed. To induce the Court to interfere in causes of action arising in a foreign jurisdiction, it must be competent to administer the appropriate equity required by the case, and capable of giving effect to its decree.

What equity has deemed the appropriate remedy in cases analogous to the present, is found in the authorities relied upon by the complainant; and that remedy is manifestly one which can only be administered by the Courts of the country in which the corporation exists, by which it has been created, and to whose laws only it is amenable. Thus in the case of Salmon *v.* The Hamburg Company, the decree was, *first*, that the company should pay the plaintiff's debt; *second*, upon non-payment thereof, that the Chancellor should order the corporation officers to make such assessment on the mem-

bers thereof as should be sufficient to pay the sum due; and, *third,* that on failure of such assessment, process should issue, to make every member of the company contribute his quota to the payment of the plaintiff's debt. In Hume *v.* The Winyaw & Wando Canal Company, the decree was that that *company* exhibit to the Master a statement of their joint stock applicable to pay the debt, and within six months make sale thereof for that purpose; on failure thereof, that each individual member should be held liable to pay his quota of the deficiency, and on the failure of any member to pay such proportion, process to issue against him to enforce the payment thereof; *unless within six months* after the decree the money was raised by assessments made and collected *by the company on its members.*

In Ward *v.* The Griswoldville Manufacturing Company, the decree asked was in the alternative, either that the defendants should pay their unpaid instalments to a receiver, to be applied by him to the payment of the corporation debts, *or* that the Court would require the directors to call in such instalments, and apply the same to discharge the debts. Now there are decrees suited to reach the real justice of all such cases. Because the obligation of the stockholders to respond to the debts of the corporation, in proportion to the extent of their unpaid instalments, is but a pledge or guarantee to the public dealing with such corporation, for the faithful performance of its obligations; and like all other guarantors, the stockholders have the right to require that the first action of the Court should be directed against those primarily liable, viz. the corporation. Such decrees as those made in the cases cited could be made by us against a Pennsylvania corporation, within our jurisdiction, in an appropriate case, and could be enforced when made. But as against a foreign corporation, we can exercise no such jurisdiction. It has no legal existence out of the boundaries of the sovereignty by which it was created: Augusta *v.* Earle, 13 Peters, 588. It must live, and has its being there only. The circumstance that one or more of its stockholders are residents of another sovereignty, makes no difference in this respect. If its official agents should even be found within a different sovereignty, by accident or otherwise, their official functions would not follow them, so as to authorize the service of process against the corporation upon them: M'Quin *v.* The Middletown Manufacturing Company, 16 Johns. 6; Peckham *v.* The North Parish in Haverhill, 16 Pick. 286. There is therefore no means in our power to get such a foreign corporation into our county; none which could

enable us to enforce our decrees. The proceedings in the cases relied upon were in fact as much against the corporation as the stockholders; and in that which manifestly formed the precedent followed in the others, we mean Salmon *v.* The Hamburg Company, the stockholders were only held liable after all remedies against the corporation were exhausted.

No trace is found of any case in which a jurisdiction identical with that invoked here, has ever been exercised by a Court of Equity; that is the case of proceedings against individual stockholders of a foreign corporation, because of the insolvency or refusal to execute its corporate duties by such corporation in the sovereignty of its creation. The inconvenience and difficulties which would arise from the exercise of such a jurisdiction are manifest. These, it is admitted, would form no just objection against the exercise of a clear jurisdiction; but they form strong reasons against the assumption of a doubtful one. Such a procedure against stockholders is founded on the theory that the proper corporate authorities have neglected or refused to perform their corporate duties, which require them to collect all unpaid instalments of the capital stock, and to apply them to the satisfaction of corporate obligations. The fact of such neglect or refusal is the predicate on which equity intervenes to make those liable immediately who are liable ultimately for the payment of the debts of the corporation. If, however, issue should be taken on the fact of such neglect or refusal, this draws with it the inquiry whether the foreign corporation has done that which its charter requires; in fine, whether the corporation has or has not been in default in its administration of corporate duties. The assumption of such a jurisdiction might draw into our Courts like inquiries, not merely affecting corporations created by our sister sovereignties, but foreign corporations, properly so called, in which a citizen, a resident, or a person temporarily in the state might be interested as a stockholder. For, the jurisdiction once admitted with reference to stockholders of corporations created by the respective states, the principle on which it rests must embrace cases of corporations, wherever existing, or by whomever created. The simple statement of such a proposition seems to us to carry with it its own condemnation. If stockholders in one state could be so proceeded against, so might they in every state of the Union of whose jurisprudence English equity formed a part. Such proceedings might even be simultaneous, and certainly could not fail to present strange conflicts of decision.

The learned counsel for the complainant have pressed upon us

the exercise of this jurisdiction, on the ground that the complainant can nowhere else obtain relief. Because they say, that inasmuch as none of the corporate officers are residents of Virginia, process cannot by the laws of that state be served on them, so as to place the winding up of the affairs of this corporation where it properly belongs—in the hands of a Virginia Court of Chancery. But admit the fact, it establishes nothing except that further legislation is required in that state to provide a manner of service of process in equity against corporate officers, who, by keeping out of that commonwealth, prevent their doings being submitted to the censure of her Courts.

If a Virginia Court of Equity could possess itself of the case of the Rappahannock Mining Company, and appoint a receiver to collect its assets, whether due by debtors or stockholders, with authority to use the name of the company, such an officer could undoubtedly sue all defaulting stockholders resident in this state, and recover unpaid instalments of stock in the same manner that the company could have done itself. In this way, the remaining assets of the company could be obtained, and be appropriated according to the laws of the state by which the Rappahannock Mining Company was chartered.

In the judgment of the Court, the defendant's demurrer must be sustained, and the plaintiffs'

Bill dismissed, but without costs.