## Kingsley International Pictures Corporation, Appellant, *v.* Blanc.

Argued April 25, 1958; reargued April 22, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and MCBRIDE, JJ.

*Harold E. Kohn,* with him *Aaron M. Fine,* and *Dilworth, Paxson, Kalish, Kohn & Dilks,* and *Ephriam S. London,* of the New York Bar, for appellant.

*James L. Stern,* Deputy City Solicitor, with him *Shirley S. Bitterman,* Assistant City Solicitor, *Leonard L. Ettinger,* Deputy City Solicitor, and *David Berger,* City Solicitor, for appellee.

*Jacob S. Richman,* for American Civil Liberties Union, under Rule 46.

OPINION BY MR. CHIEF JUSTICE JONES, July 2, 1959:

The question on this appeal is whether equity has jurisdiction of the subject matter of the complaint. Although that, and that alone, is the sole question of law here involved, it will require a factual recital of some length for a correct understanding of the legal problem from which the court below appears to have been diverted by extraneous and immaterial considerations. There were two appeals by the plaintiff, one from the order refusing a preliminary injunction and the other from the final decree dismissing the complaint. Only the later appeal need any longer be considered and the earlier will be *non prossed.*

The plaintiff, Kingsley International Pictures Corporation, of New York and having its principal place

of business there, instituted this suit in equity in the court below against Victor Blanc, District Attorney of the City and County of Philadelphia, seeking an injunction, preliminary until hearing and thereafter permanent, to restrain the defendant from interfering with the commercial exhibition of a motion picture entitled *And God Created Woman*. The plaintiff corporation is the exclusive distributor of the film in the United States and had contracted with the respective owners of two motion picture theatres in Philadelphia for their simultaneous exhibition of the film beginning February 5, 1958. Approximately three weeks prior to that date, an Assistant District Attorney, acting under the direction of the defendant, asked the plaintiff for a private showing of the film for his inspection. The complaint alleges that, on January 28, 1958, the Assistant District Attorney, after having viewed the film, informed the plaintiff's attorney that in the judgment of the District Attorney's office, the showing of the film would constitute a violation of Section 528 of The Penal Code of June 24, 1939, P.L. 872, 18 PS §4528, and that, in the event the motion picture was publicly exhibited in Philadelphia, the persons responsible for showing it would be arrested and the films would be seized. Thereupon, the owners of the two Philadelphia theatres notified the plaintiff that they would not exhibit the film under the then existing circumstances, and thus would breach their contract with the plaintiff.

Section 528 of The Penal Code makes it a misdemeanor to show ". . . moving pictures, of a lascivious, sacrilegious, obscene, indecent, or immoral nature and character, or such as might tend to corrupt morals . . . ." The complaint avers that this statute is so vague, in the terms which it employs to define a crime, as to constitute its enforcement a violation of the due process clause of the Fourteenth Amendment of the

Federal Constitution. See *Commonwealth v. Blumenstein,* 396 Pa. 417. We have declared the Act unconstitutional because of the vagueness of certain of the descriptive terms used in Section 528. However, our invalidation of the statute is not dispositive of the instant case. If, as a result of this appeal, it is determined that the complaint makes out a case for equitable relief, the plaintiff will be entitled to an adjudication of its rights in the premises and, if successful on final hearing, an injunction with costs.

The complaint further avers that the film is not obscene; that its exhibition would not violate any valid statute of the Commonwealth of Pennsylvania; that, if relief is not granted, the plaintiff corporation would suffer irreparable injury; and that there will be a multiplicity of prosecutions of persons with whom the plaintiff contracts for exhibition of the film.

Confronted with the threats of the District Attorney and the refusals of the theatre owners to exhibit the film, the plaintiff company filed its complaint in the instant suit on February 4, 1958, the day before the scheduled opening of the Philadelphia exhibition of the film. On February 5th a hearing was held by the court below on the plaintiff's motion for a preliminary injunction. At that time the defendant filed a responsive answer which, although admitting most of the material averments of the complaint, directly put in issue by denial the factual averment that the film was not obscene.* At the court's suggestion the defendant

---

* At the hearing the plaintiff read in evidence untraversed paragraph 4 of the complaint as follows: "The film has been shown in the following major cities, among others: Boston, Worcester and Fitchburg in Massachusetts; Hartford, New Haven, Stamford and Greenwich in Connecticut; Washington, D. C.; San Francisco and Los Angeles in California; Houston and Dallas in Texas; Chicago, Illinois; St. Louis; Cleveland and Canton in Ohio; Louisville, Kentucky; Seattle and Portland in Washington; Atlanta, Georgia;

agreed to the film's being shown publicly without interruption pending a determination by the court with respect to the request for a preliminary injunction. As a consequence the picture was publicly shown at the two theatres on February 5th as originally scheduled. At the hearing on February 5th the plaintiff introduced evidence as to the threats which had been made by the defendant and as to the irreparable harm which the plaintiff had suffered and would suffer as a result of the defendant's action. The defendant offered no evidence to refute the need of a preliminary injunction.

A second hearing was held on February 10, 1958, on the plaintiff's application for a preliminary injunction. At that time a Deputy City Solicitor appeared as counsel for the District Attorney pursuant to the requirement of Section 4-400 of the Philadelphia Home Rule Charter. Notwithstanding that the defendant had already filed a responsive answer to the complaint, the Deputy City Solicitor filed preliminary objections which assigned, inter alia, as ground for the dismissal of the bill, that equity is without jurisdiction to entertain the subject matter of the complaint.

On February 11, 1958, the court denied the plaintiff's application for a preliminary injunction and, on the same day, the District Attorney seized the films at the two theatres and arrested the managers. The plaintiff company immediately appealed to this court from the order denying it a preliminary injunction and, on February 13, we entered an order restraining the

New York City and Syracuse in New York; Baltimore, Maryland; and Pittsburgh, Pennsylvania. This film was passed by the United States Customs authorities and licensed for exhibition in the States of New York, Virginia and Maryland. The licensing of the film by the State censorship boards of the states referred to is in effect a determination that the film is not obscene. Said film has met with general public acceptance and considerable financial success wherever exhibited."

District Attorney from interfering with the showing of the film at either theatre "until final decree of the court below in the equity suit there pending." By stipulation, the District Attorney retained one print of the seized films for evidentiary purposes later.

After argument on the preliminary objections the court below entered a decree on March 5, 1958, sustaining the preliminary objections and dismissing the bill on the ground that equity was without jurisdiction. On the following day the District Attorney again seized the films at the two theatres.

The plaintiff took the present appeal to this court from the final decree dismissing the bill and petitioned for a supersedeas. After argument thereon we ordered the District Attorney not to interfere with the exhibition of the film until final disposition of the equity suit.

The managers of the two theatres have been indicted under Section 528 of The Penal Code, supra, for exhibiting the film, and also under Section 524, for possession of obscene literature. These criminal proceedings have been continued pending disposition of this case. The indictments allege that the criminal acts charged against the managers of the theatres were committed on or about February 5, 1958—the date on which the showing of the films in Philadelphia began. At the hearing conducted by the court below on that very day, it had been agreed that nothing would be done by way of arresting the exhibitors or seizing the film until the court had witnessed an exhibition and had determined its attitude. The record clearly indicates that the managers of the two theatres would not have exhibited the film if the District Attorney had not agreed that there would be no interference with the showing at that time.

As stated at the outset, the sole question on this appeal is whether, under the facts averred in the complaint, a court of equity has jurisdiction to enjoin the District Attorney from interfering with the exhibition of the motion picture films with consequent irreparable harm to the property rights of the plaintiff.

It is well settled that ordinarily equity will not restrain the prosecution of a criminal proceeding. *Meadville Park Theatre Corporation v. Mook*, 337 Pa. 21, 24, 10 A. 2d 437. The rationale of the rule is that the accused has an adequate remedy at law by pleading at the time of the criminal prosecution, the invalidity of the statute whereon his indictment is based, or any other defense available to him: *Duquesne Light Company v. Upper St. Clair Township*, 377 Pa. 323, 341, 105 A. 2d 287. This rule has no application, however, where, as in the instant case, the equity proceeding is instituted by a person who is not a party to the criminal proceeding but who nevertheless has property rights which will be irreparably injured by the prosecuting activities of the District Attorney. In such a situation equity has jurisdiction because the plaintiff has no adequate and complete remedy at law. Indeed, he has no other remedy at all.

The rule is well set out in *Pennsylvania Railroad Company v. Bogert*, 209 Pa. 589, 601, 59 A. 100, which quoted, in part, from *Bank of Virginia v. Adams*, 1 Parsons 534, that ". . . when from the nature and complications of a given case, its justice can best be reached, by means of the flexible machinery of a court of equity, in short where a full, perfect and complete remedy cannot be afforded at law, equity extends its jurisdiction in furtherance of justice", to which the opinion writer added, "Or as Story states in sec. 33, 'The remedy at law must be plain; for if it be doubtful and obscure at law equity will assert a jurisdiction.' "

See *Pennsylvania State Chamber of Commerce v. Torquato*, 386 Pa. 306, 329, 125 A. 2d 755, where we again quoted with approval as in the *Bogert* case, supra.

In the instant case the remedy at law is not even doubtful and obscure; it is wholly non-existent. The plaintiff cannot have its property rights protected against invasion by the defendant in a criminal proceeding to which it is not a party and to which it cannot be made amenable. The fundamental rule whereby equity affords the necessary relief in the circumstances here present is well illustrated by the case of *Adams v. New Kensington*, 357 Pa. 557, 560-561, 55 A. 2d 392. There, the plaintiff, who leased juke boxes to various establishments, sought to enjoin the enforcement of a city ordinance regulating the licensing of establishments having possession of such juke boxes. Fines and jail sentences were to be imposed for any violation of the ordinance. The court recognized that equity has jurisdiction to adjudicate the plaintiff's rights. Mr. Justice STERN, speaking for a unanimous court, stated "But equity does have jurisdiction to enjoin such a [criminal] prosecution where it is alleged not only that the statute or ordinance is unconstitutional and void but that its enforcement would cause the plaintiff irreparable loss to his property, either by effecting, if not a total suppression of his business, at least a grave interference therewith, or by subjecting him to the imposition of cumulative, exorbitant and oppressive penalties pending judicial determination of the validity of the legislation. In such cases, the ground of equitable jurisdiction is the protection of property rights, and the fact that a criminal proceeding is involved is merely incidental [citing cases]."

The identical problem was considered by the United States Supreme Court in the well known case of *Pierce*

*v. Society of Sisters*, 268 U.S. 510, 534-536. In that case, the plaintiffs, who operated private schools in Oregon, sought to restrain State officers from enforcing a statute requiring parents and others having control of young children to send them to the public schools conducted by the State. Fine or imprisonment could be imposed upon parents for failure to abide by the provisions of the Act. The Court, holding that equity had jurisdiction to grant the relief requested by those who operated the private schools, said, "The inevitable practical result of enforcing the Act under consideration would be destruction of appellees' primary schools, and perhaps all other private primary schools for normal children within the State of Oregon. . . . Plaintiffs asked protection against arbitrary, unreasonable and unlawful interference with their patrons and the consequent destruction of their business and property. Their interest is clear and immediate, within the rule approved in Truax v. Raich, [239 U.S. 33] . . . and many other cases where injunctions have issued to protect business enterprises against interference with the freedom of patrons or customers." The case holds that the threatened imposition of criminal penalties against the patrons of the school constituted an irreparable injury to those who operated the school. Similarly, here, the threatened criminal prosecution of the managers of the two moving picture theatres in Philadelphia, who had contracted to show the film, constituted an irreparable injury to the plaintiff corporation which distributes and leases the film.

In *Truax v. Raich*, 239 U.S. 33, 37-39, cited by the Supreme Court in the *Society of Sisters* case, supra, the plaintiff sought to enjoin the Attorney General of Arizona from enforcing against his employer a State statute compelling an employer to hire not less than 80% qualified electors or native born citizens. Criminal

prosecutions had been instituted against the employer allegedly for having violated the provisions of the statute. As a result of these prosecutions the plaintiff had been threatened with the loss of his job. The Supreme Court held that equity had jurisdiction since the prevention of the prosecutions was essential to safeguarding rights of property and, without the relief, the complainant would have no adequate remedy. See also *Terrace v. Thompson*, 263 U.S. 197, 214, where the Supreme Court again held that equity jurisdiction to enjoin criminal prosecutions will be exercised wherever it is essential effectively to protect property rights and the rights of persons against injuries otherwise irremediable.

That equity will enjoin criminal proceedings to prevent irremediable injury to property rights is confirmed by the ruling of this court in *Mahoning & Shenango Railway & Light Company v. New Castle*, 233 Pa. 413, 418, 82 A. 501, where a street railway company brought a bill in equity to restrain the enforcement of a municipal penal ordinance requiring it to install certain specified safety brakes. The city officials had threatened to arrest the motormen and conductors in charge of the plaintiff's cars. Holding that equity had jurisdiction to restrain the prosecutions, we said, "It was the threat to take the employees of the plaintiff company off its cars by arrest which caused the filing of the bill. Had this threat been carried out it would have meant the tying up of the plaintiff's lines and a serious interference with the use of its property. Under such circumstances, if the ordinance was invalid, there was ample authority to sustain equitable interference." In that case, just as in the instant case, the plaintiff company would not have been a party to the threatened criminal proceedings; hence its property rights could never have been adjudicated properly and adequately if equity had refused to take jurisdiction.

The case of *Morrison v. Davis*, 252 F. 2d 102, 103, is presently quite apposite: Certain Negro citizens sought to enjoin enforcement of Louisiana statutes requiring segregation of the races on public transportation facilities. The statute imposed criminal penalties against the operators of the vehicles if the segregation was not enforced. The court held the individual plaintiffs could properly invoke equity's aid to enjoin the enforcement of the statute, pertinently saying in that connection,—"These plaintiffs are not being prosecuted; they have not violated the state law; they are seriously affected by the provision of the statute which places a criminal penalty on the street car operators who permit them to travel on a street car without complying with the unconstitutional statute. They are asking relief from such constraint. Since all transportation can be denied them under the statute unless they obey the illegal requirement, it is not even apparent that they could put themselves in position to be arrested and prosecuted even if they sought to test their constitutional rights in that manner, which we hold they do not have to do." The foregoing statement is equally applicable to the situation of the present plaintiff in respect of its invaded property rights.

In *Nelson v. Jessup*, 134 F. Supp. 221, 229, an interstate motor carrier sought to enjoin State police officers from arresting the carrier's drivers on charges that the goods being transported was a business not authorized under the State's permit to the carrier. The court held that the plaintiff corporation, itself not the subject of a criminal prosecution, could invoke equity's jurisdiction to enjoin threatened criminal prosecution against third persons which would result in injury to the plaintiff's property rights. The court made a finding, which is equally pertinent to the present case, that, "the threat of irreparable injury is implicit in the defendants' joint answer wherein it is averred that de-

fendants intend to cause further arrests of plaintiff's drivers in this situation."

The complaint in the instant case unquestionably makes out a case for equitable jurisdiction. Consequently, the court below erred in dismissing the bill.

Decree reversed with a procedendo; costs to abide the event.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In view of the fact that this Court has today (in the case of *Commonwealth v. Blumenstein,* 396 Pa. 417) declared Section 528 of the Act of 1939 unconstitutional, it seems to me that to adjudicate the issues originally involved in the present litigation is like trying to enforce law in a county which has no sheriff. If the defendants, who were indicted under the Act of 1939, cannot be prosecuted, why enjoin the District Attorney from prosecuting them? The proposed injunction, as the law now stands, is like enjoining a person from swimming in a river which is empty of water.

Nevertheless, since the Majority has filed an opinion on the subject if for no other reason than to dispose of the costs, I believe, with due regard for the responsibilities of my office, that I must at least say this much, namely: If, in the final disposition of the case in the court below, the injunction is granted against the District Attorney, (although I can't understand why) the costs should under no circumstances be placed on the District Attorney. To do so, would be not only inequitable but, as I view the case, contrary to the most elementary rules of justice. To impose costs on a district attorney because of an injunction action begun by someone else,—an injunction which sought to impede the District Attorney in the discharge of his sworn duty,—would represent to me the ultimate in legal paradox and the apogee of jurisprudential outrage.

Since the Majority in this case re-affirms its decision in the case of *Commonwealth v. Blumenstein*, 396 Pa. 417, I wish to incorporate by reference the Dissenting Opinion I filed in that case.

The facts involved in this appeal are very simple. The plaintiff, Kingsley International Pictures Corporation, is the exclusive distributor in the United States of an alleged obscene motion picture entitled "And God Created Woman". The District Attorney of Philadelphia County viewed the picture and, in the exercise of his discretion as a quasi-judicial officer, concluded that the picture came within the prohibition outlined in Section 528 of the Act of 1939. In discussing the equity action in this case we must assume that Section 528 is still constitutional because we must appraise the situation as it appeared to the District Attorney in February, 1958, when the people of Pennsylvania still believed that our criminal code proscribed lascivious, obscene, indecent and immoral films.

The District Attorney, satisfied that the exhibitors of the film in question, were violating The Penal Code, seized the film and instituted criminal proceedings against two exhibitors in Philadelphia. The plaintiff in New York, remaining far from the battle scene, asked for an injunction in our Philadelphia courts to prevent the District Attorney from proceeding with the criminal actions indicated. In the complaint the plaintiff denied that the picture was obscene and said: "Said film has met with general public acceptance and considerable financial success whenever exhibited."

I make no comment on the merits or demerits of the film since I have not seen it nor have I read any judicial description of it. I would say, however, that the fact it has met with financial success is no proof to me that it is lily white pure. There can be little doubt that there were many people in the days of the Augean

Stables who would gladly have paid an admission price to see them because, although difficult to explain, there do exist people who enjoy that type of scenery and effluvium.

The decent and morally upright people of the Commonwealth do not have to be subjected to morally corruptive influences because of a small minority with prurient inclinations. The Supreme Court of New York well stated this situation in the case of *Kingsley International Pictures v. Regents of University,* 4 N.Y. 2d 349 : "Essentially, then the question amounts to this : What can society do about protecting itself from motion pictures which are corruptive of the public morals? We hold that it may refuse to license a motion picture which alluringly portrays adultery as proper behavior. We so hold with full confidence that our Founding Fathers never intended that our Federal Constitution be the altar upon which this State, and this nation must sacrifice themselves to the ravages of moral corruption. Our Constitution is a document for government, not a tool for anarchy or a license for corruption."

In emphasizing the deleterious effect that an immoral motion picture may have on a community, the New York Court said further: "This is not a case of a book on a shelf or in a home—it is a case of *mass* dissemination of approved illicit sex by the spoken word and a visual art. It is a case not of one showing but hundreds of showings. It is a case not of an audience of one, but audiences of hundreds—in some cases thousands—at *each* showing. It is a case not merely of a theme of words, but a theme woven about scenes clearly portraying and suggesting acts of adultery."

Chief Justice WARREN excellently stated, in his Concurring Opinion in the case of *Roth v. United States,* 354 U.S. 476, 495, the governmental duty to punish

purveyors of filth: "The defendants in both these cases were engaged in the business of purveying textual or graphic matter openly advertised to appeal to the erotic interest of their customers. They were plainly engaged in the commercial exploitation of the morbid and shameful craving for materials with prurient effect. *I believe that the State and Federal Governments can constitutionally punish such conduct."*

The Constitution of the State of Pennsylvania has reposed in the hands of the District Attorney the power and authority, as well as responsibility of protecting the people from those who would attack the public health and welfare. In discharging his responsibilities under the Constitution and the laws of the Commonwealth he is required to enforce the obscenity statutes of the General Assembly. That is what District Attorney Victor Blanc attempted to do in this case and it is incredible that he should be restrained through the processes of law from doing what the law requires him to do. And it is utterly shocking that he should be restrained from protecting the rights of the citizens of Philadelphia who elected him to do that very thing.

The complaint of the Kingsley Pictures Corporation was filed on February 4, 1958. After various proceedings not necessary to dwell on here, the Court of Common Pleas dismissed the complaint on March 6, 1958. The plaintiff appealed to this Court and asked for a supersedeas. This Court granted the supersedeas and ordered the District Attorney not to interfere with the showing of the film until final disposition by this Court of the pending appeal.

This Court now sustains the appeal and, in doing so, lays down an extraordinary and, to me, alarming doctrine, namely, that a District Attorney may be enjoined from proceeding in a criminal case. If Equity possesses such authority, it cannot be said that it is an authority which is hoary with age. As recently as

1940, this Court said in the case of *Meadville Park T. Corp. v. Mook,* 337 Pa. 24: "That a court of equity's restraining of a district attorney in the performance of his official duty is a most unusual procedure is evidenced by the fact that *this is the first time* any appellate court of this state has been called to review such a case."*

In that case the District Attorney of Crawford County initiated by information a criminal prosecution before an alderman against the defendants, charging them with operating a lottery. The Court of Common Pleas of that county, upon an application therefor by the defendants, granted an injunction against the District Attorney. On appeal, we reversed, saying: "A district attorney is a constitutional officer with a mandate from the state to proceed with prosecutions of violations of criminal laws. Only confusion and frustration in the enforcement of these laws would result if a person arrested or about to be arrested for their violation could by transforming himself into a complainant and a district attorney into a defendant, in civil proceedings, have his guilt or innocence adjudicated by a *court of equity.* The Commonwealth (as well as alleged law breakers) has an interest in the maintenance of the right of trial by jury. The machinery of the criminal law is designed for the protection of society and the office of district attorney is an important part of that machinery. It is difficult to conceive of anything more opposed to sound public policy than to permit an accused to obstruct by means of a suit in equity to which *the state itself* is not a party the operation in his case of the machinery of criminal procedure which has been constitutionally established to protect the public welfare." (Italics in original)

---

* Italics, mine, unless otherwise indicated.

It is true that the Majority in its Opinion makes a distinction between this case and the one at bar (as will be discussed later) but the fact still remains, as stated by the Supreme Court of the United States in the case of *Hygrade Provision Co. v. Sherman,* 266 U.S. 497: "The general rule is that equity will not interfere to prevent the enforcement of a criminal statute *even though unconstitutional.*"

In another United States Supreme Court case, the Court said: "A court of equity . . . has no jurisdiction over the prosecution, the punishment or the pardon of crimes or misdemeanors, or over the appointment and removal of public officers. To assume such a jurisdiction, or to sustain a bill in equity to restrain or relieve against proceedings for the punishment of offenses, or for the removal of public officers, *is to invade the domain of the courts of common law, or of the executive and administrative department of the government.*" *(Sawyer et al.,* 124 U.S. 200, 210)

In attempting to distinguish the *Meadville Park* case from the case at bar, the Majority says that in the former case the plaintiff did have a remedy at law, whereas in the latter the plaintiff has no adequate and complete remedy at law. The Majority makes it even stronger by saying that the plaintiff "has no other remedy at all."

This statement, I respectfully submit, does not at all agree with the realities of the situation. An immediate trial under Section 528 of The Penal Code would have given the plaintiff his remedy. His "remedy" incidentally, was only that he should have an opportunity to ascertain authoritatively whether his film was a legal property or not because it cannot be pretended that he would have any right of property in a product which, in fact, was illegal. If the trials of the two exhibitors had taken place in the early part of 1958, as it was the wish and intention of the Dis-

trict Attorney that they take place, Kingsley would have known in a matter of weeks whether its film was legal in Pennsylvania. If the verdicts established the film not to be obscene the most the plaintiff would have suffered would have been the loss of several weeks' receipts which unquestionably it would immediately have recouped. If, on the other hand the film would have been proved obscene, then Kingsley would have had no property rights to be protected because, obviously, as I must repeat, no one can have property rights in an illegal thing.

The Majority completely ignores the rights of the public in this matter. The public has the right to be protected from lewd, lascivious and immoral exhibitions. This Court makes not one reference to the public in its Opinion. It seems to assume that the only question in the case was: How was Kingsley to be protected? Suppose Kingsley had owned a couple of poisonous snakes which it wished to exhibit on an admission fee basis. And suppose the municipal authorities concluded that the mere presence of the snakes in public constituted a mortal danger to spectators and bystanders. Would this Court, in such a situation, be concerned only with protecting the property rights of Kingsley and ignore the public peril presented by the snakes?

Had the District Attorney been allowed to try the two exhibitors, who were duly charged with committing a crime, the public would have been shielded from indecent performances, and Kingsley would have had his property rights resolved. But, instead of allowing the law to take its course, this Court by the positive act of ordering the District Attorney not to interfere with the exhibition of the film, and by the negative action of withholding decision for over a year, allowed the public to be subjected to the film's obnoxiousness for all that time, so that whatever rights the public

possessed to be guarded from obscenity and indecent exhibitions have been completely dissipated, through no fault of its own.

So far as we now know the film could have been more than obscene, it could have been pornographic, and yet the public, including girls, young boys, and women were left absolutely defenseless before its vulgar assaults on public morals.

It is my belief that in this case the powers of Equity have been grossly abused. The rights of property in a film certainly do not rise and should not rise higher than the rights of the people to be protected from public corruption.

I wish to repeat that I disagree with the Majority that the plaintiff was without remedy at law. The City Solicitor, in his brief, makes the following statement which is not controverted: "When the District Attorney on March 25, 1958, moved to list the criminal cases against the exhibitors at an early date, he met with objection from the plaintiff. . . Again on April 8, 1958, when the defendants in the above docketed criminal cases should have been arraigned, the defense objected on the ground that the present appeals should first be determined."

It is thus obvious that the plaintiff did not want an immediate adjudication as to whether its film was obscene or not. The plaintiff preferred to remain in the civil courts as long as possible because, with a supersedeas which allowed it to exhibit the picture and continue to make money, it had nothing to lose and everything to gain by a delayed decision. The very thing which the plaintiff obviously planned has triumphed. The plaintiff has squeezed every possible lucrative return out of the film. It has been run and re-run in many theatres so that even if the injunction Kingsley asked for were denied it would lose nothing because

the picture has by now completely exhausted its profits-producing potentialities. Thus, Equity has been made the vehicle for a money-making scheme on a product which, so far as this Court knows, may be the filthiest film ever made.

And now, with this Court declaring Section 528 of The Penal Code unconstitutional, the plaintiff has achieved a victory beyond every possible anticipatory dream and the public has lost even the right to have been informed as to whether or not the Courts regarded the film as violative of the moral standards which are inextricably woven into the law of the land.

In support of its position the Majority has cited *Pennsylvania Railroad Company v. Bogert,* 209 Pa. 589, but the decision in that case cannot possibly apply to the facts in the case at bar. Our Court said there, as quoted by the Majority Opinion: ". . . when from the nature and *complications* of a given case, its justice can best be reached, by means of the flexible machinery of a court of equity, in short where a full, perfect and complete remedy cannot be afforded at law, equity extends its jurisdiction in furtherance of justice.'" The facts in that case were indeed complicated. The first sentence in the Court's Opinion read: "It is impossible to gather a clear chronological history of this case from the *jumbled-up records* in the paper-books before us." But there was nothing jumbled up about the case at bar. There was no need for Kingsley to resort to Equity because of complicated facts.

The Majority Opinion quotes further from the *Bogert* case, namely: "'The remedy at law must be plain; for if it be doubtful and obscure at law equity will assert a jurisdiction.'" But there was nothing doubtful and obscure about the indictments against the two exhibitors of the film "And God Created Woman." The plaintiff had a remedy at law which was very

plain. That remedy lay in the Court of Quarter Sessions where the court was prepared and the District Attorney was eager to try the cases without any delay whatsoever.

It was the plaintiff who wished to make the matter complicated, it was the plaintiff who wished to obscure the issue, it was the plaintiff who planned the involvement of Equity in a matter which was absolutely foreign to its jurisdiction. And then, it was and is this Court which allowed the plaintiff to gain an advantage to which it was not entitled, and, in doing so, this Court has indeed complicated criminal law and equity procedure to a degree which I shudder to contemplate.

I do not comprehend the Majority Opinion's defense of property rights over the rights of the public. Would the distributor of a palpable gambling device have the right to enjoin the District Attorney from prosecuting the operator of such a device, simply because property rights are involved? Suppose Mr. A set up in Pennsylvania a race track replete with gambling booths, and the operators of the booths were arrested and indicted for violating the laws of the Commonwealth, would the owner of the race horses have the right to enjoin the District Attorney from proceeding against the gamblers simply because his horses were involved in the transaction? And if he would not have that right, on what basis can this Court say that the owner of an alleged obscene picture has more rights than the owner of legal horses?

The Majority Opinion says: "In the instant case the remedy at law is not even doubtful and obscure; it is wholly nonexistent. The plaintiff cannot have its property rights protected against invasion by the defendant in a criminal proceeding to which it is not a party and to which it cannot be made amenable." The Kingsley

Corporation could easily have made itself amenable to the criminal proceeding by coming into Pennsylvania. If, in fact, the picture was actually obscene, why should the plaintiff be allowed to use our Courts by remote control? Why should our Courts offer jurisdiction to persons who remain outside Pennsylvania while their illegal product circulates in Pennsylvania? Why should the plaintiff enjoy an immunity which is not given to those who are charged with violating The Penal Code in other particulars? The distributor of an obscene film is as much a violator of law as a man who commits larceny, robbery or burglary.

The case of *Adams v. New Kensington,* 375 Pa. 557, which the Majority cites in presumed support of its position gives it no support whatever. On the contrary, it flatly repudiates the Majority's position! In that case the City of New Kensington passed an ordinance which required juke box owners to pay a certain license fee, the failure to pay which, would subject the owners to certain penalties. The plaintiff Adams filed a bill in equity to enjoin the enforcement of the ordinance, which, he asserted, was unconstitutional. The Court granted the injunction. This Court, however, vacated the injunction, and declared wisely, and with full appreciation of the dignity of Equity: "It is elementary that an injunction will *not be granted to restrain criminal prosecutions* on the mere ground that the statute or ordinance on which the prosecution is based is, for any reason, unenforceable, since the party has an adequate remedy at law; he may establish at trial, by way of defense, the invalidity of the legislative enactment."

Nor do the other cases cited by the Majority support its thesis. The principle fallacy in the Majority's position is that it fails to distinguish between cases where the object in dispute is alleged to be criminal in

itself and cases where the object is inherently legal but is being illegally used. For instance, in the case of *Morrison v. Davis,* 252 F. 2d 102, cited by the Majority, the statute in issue imposed criminal penalties against operators of public transportation vehicles if they did not enforce segregation. The Court held that the enforcement of the statute could be enjoined. But it is to be particularly noted that no one claimed that there was anything illegal about the buses or rail cars. It was the *use* to which they were being put which was illegal. In the case at bar, however, the Commonwealth asserted that the film itself was intrinsically illegal: it was obscene and, therefore, contraband.

I am afraid that by its decision of today this Court has thrown a large monkey wrench into the prosecution machinery of the Commonwealth. I do not think it can be denied that in most criminal cases some property rights are involved. In such cases the owner may conveniently make himself a stalking horse for the defendant by going into Equity and requesting an injunction against the District Attorney on the basis that his property rights must be protected. The proceedings in Equity can then be protracted until witnesses in the criminal case move away or die, documents are lost or disappear and interest in the prosecution wanes, or disappears.

It is with a great deal of melancholy that I survey, as the people of this State must survey, the situation in Pennsylvania today on the subject of the efforts of the representatives of the people in the General Assembly to keep immoral and obscene motion pictures out of Pennsylvania.

With what was begun in the *Hallmark* case, continued in the *Blumenstein* case, and now devastatingly completed in the present case, the prosecution machinery of the State in obscene film cases has been

reduced to a shambles. It is inevitable that the district attorneys and the police departments throughout Pennsylvania will be demoralized and bewildered as to what they can or should do to keep out of the State the carpetbaggers of filth, prevent the importation of pornography, and restrain the merchants of obscenity.

Unless the General Assembly comes to the aid of the people with renewed legislation and William Penn comes down from his pedestal atop City Hall to protect the State he founded against the forces of immorality at our borders, far more damaging to the welfare of the people than the Indians he encountered, the fair Commonwealth which he dedicated to religious freedom, civic liberties and moral purity, may well be on the way to a cinematic Gomorrah.