Commonwealth *v.* Blumenstein, Appellant.

418

Argued January 14, 1958; reargued April 22, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

*Max Rosenn*, with him *Rosenn, Jenkins & Greenwald*, for appellant.

*Ralph P. Needle*, Assistant District Attorney, with him *Carlon M. O'Malley*, District Attorney, for appellee.

*Edwin P. Rome*, with him *Morris L. Weisberg*, and *Julian E. Goldberg*, for American Civil Liberties Union, under Rule 46.

Opinion by Mr. Justice Bok, July 2, 1959:

This is an appeal, on allocatur, from the decision of the Superior Court affirming a conviction and sentence.

Defendant was the manager of a drive-in cinema theatre in Lackawanna County and was arrested by state officers for having shown certain films in October, 1956. He was indicted for having unlawfully exhibited obscene motion pictures under the Act of June 24, 1939, P.L. 872, §528; 18 P.S. §4528, which reads as follows: "Whoever gives or participates in or being the owner of any premises, or having control thereof, permits within or on said premises, any dramatic, theatrical, operatic, or vaudeville exhibition, or the exhibition of fixed or moving pictures of a lascivious, sacrilegious, obscene, indecent or immoral nature and character, or such as might tend to corrupt morals, is guilty of a misdemeanor. . . ."

In *Hallmark Productions, Inc. v. Carroll,* 384 Pa. 348, 358, 121 A. 2d 584 (1956), this court held invalid the Motion Picture Censorship Act of 1915, as amended, and in the course of the opinion Mr. Chief Justice Stern said: "It need hardly be added that even if all precensorship of motion picture films were to be held invalid this would not in and of itself affect the right to suppress objectionable films if exhibited, or to punish their exhibitor."

This reference to the common law remedy, apart from statute, is supported by *Commonwealth v. Sharpless,* 2 S. & R. 91 (1815), and *Barker v. Commonwealth,* 19 Pa. 412 (1852), both involving common law prosecutions, one for exhibiting an obscene picture, and the other for obscene public speech. The indictment in both cases charged intent, and since the indictment in the case at bar does not, it is clear that the prosecution before us was brought under the statute and not under

the common law. Hence the efficacy of the common law remedy against obscenity is not in issue.

The decisions of the Federal courts are conclusive.

The word "sacrilegious" was held unconstitutional by the Supreme Court of the United States in *Burstyn v. Wilson*, 343 U.S. 495, 72 S. Ct. 777 (1952), a motion picture case. The case held that the cinema is within the free speech and press protection of the First and Fourteenth Amendments.

The test of being "lascivious, indecent, immoral or impure" and "tending to corrupt morals" was rejected by the Supreme Court in reversing, per curiam, *Superior Films v. Department of Education of Ohio* and *Commercial Pictures v. Regents of the University*, 346 U.S. 587, 74 S. Ct. 286 (1954), citing *Burstyn*. This case also involved a motion picture.

The remaining words of Section 528 are "lascivious, obscene, and indecent". In the cases of *U. S. v. Clarke*, D. C., 38 F. 732 (1889) and *U. S. v. Davidson*, D. C. 244 F. 523 (1917) "lascivious" and "lewd" are held to be synonymous, and "lewd" and "obscene" are given as definitions for "indecent": see also *Swearingen v. U. S.*, 161 U.S. 446, 16 S. Ct. 562 (1896); *U. S. v. Ulysses*, 72 F. 2d 705 (1934).

This leaves the single term "obscene" to consider.

It was held unconstitutional, per curiam, citing *Burstyn* and *Superior Films*, in *Holmby Productions, Inc. v. Vaughn*, 350 U.S. 870, 76 S. Ct. 117 (1955), a motion picture case. The phrase under attack was "obscene, indecent, or immoral or such as tend to debase or corrupt morals."

In June, 1957, the United States Supreme Court decided *Roth & Alberts v. U. S.*, 354 U.S. 476, 77 S. Ct. 1304 (1957) a book case, in which "the dispositive question is whether obscenity is utterance within the area

of protected speech and press", and held that it was not. The opinion refers to "the proper standard for judging obscenity" and states it to be this: "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest."

Five months later the Supreme Court reversed *Times Film Corp. v. Chicago*, 355 U.S. 35, 78 S. Ct. 115 (1957), a motion picture case, citing *Roth & Alberts*. The Circuit Court had held: "The ordinance now under attack, as we have seen, uses the words 'immoral or obscene'. The Illinois Supreme Court has held, in speaking of this ordinance, that these words are synonymous and that a motion picture is obscene or immoral, within the meaning of the ordinance, if, when considered as a whole, its calculated purpose or dominant effect is substantially to arouse sexual desires, and if the probability of this effect is so great as to outweigh whatever artistic or other merits the film may possess. . . . With this interpretation of the words 'obscene' and 'immoral' read into the ordinance now before us, we believe the ordinance is not vague, as contended by plaintiff. Those words are precise and they constitute a proper test in the case at bar."

If the *Times Film* standard could not pass the *Roth & Alberts* test, *a fortiori* Section 528 cannot either.

In this posture of the law our conclusion in *Hallmark* is dispositive: "The picture involved in the present case was disapproved by the Board of Censors because it was 'indecent and immoral and, in the judgment of the Board tended to debase and corrupt morals'. In view of the foregoing decisions of the Supreme Court [not including Roth & Alberts, which was written later], individually and collectively, we are of opinion that these terms must be held subject to the same fatal

objections as those which invalidated the statutes held unconstitutional by that Court."

Judgment reversed and defendant discharged.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

I believe that the decisions of the Supreme Court of the United States on the Constitutionality of statutes which prohibit the obscene or the immoral or the sacrilegious, are confusing, but the recent cases of *Roth v. United States* and *Alberts v. California*, 354 U.S. 476 (1957)—subsequent to *Burstyn, Inc. v. Wilson*, 343 U.S. 495, which compelled this Court's decision in *Hallmark Productions, Inc. v. Carroll*, 384 Pa. 348, 121 A. 2d 584—indicate that these words are no longer considered too vague and indefinite. The *Roth* and the *Alberts* cases sustained the validity of statutes which prohibited the obscene.*

An act of obscenity has been an offense against the public for centuries and has been so recognized by the Courts of England, by the Courts of Pennsylvania and by the Federal Courts: *Rex v. Curl*, 2 Str. 789 (1727); *Commonwealth v. New*, 142 Pa. Superior Ct. 358, 16 A. 2d 437; *Commonwealth v. Donaducy*, 167 Pa. Superior Ct. 611, 76 A. 2d 440; cf. also *Chaplinsky v. New Hampshire*, 315 U.S. 568; *Winters v. People of the State of New York*, 333 U.S. 507; *Commonwealth v. De-Grange*, 97 Pa. Superior Ct. 181; *Commonwealth v. Schoen*, 25 Pa. Superior Ct. 211.

I believe that the words obscene, immoral and sacrilegious are words of such general and common usage that they have acquired a well and commonly

---

* Cf. however, *Times Film Corp. v. City of Chicago*, 355 U.S. 35. Cf. also, *Holmby Productions, Inc. v. Kansas State Board of Review*, 350 U.S. 870; *Superior Films v. Department of Education* and *Commercial Pictures v. Regents*, 346 U.S. 587.

understood meaning. I would therefore protect the interests of the moral and deeply religious people of Pennsylvania by sustaining the validity and the Constitutionality of our statutes which punish the obscene or the immoral or the sacrilegious.*

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

By declaring Section 528 of The Penal Code of 1939 unconstitutional, the Supreme Court has today struck from the hands of every District Attorney in Pennsylvania the last remaining available weapon with which to fight the forces of indecency which for a long time have been trying to capture the moving picture screens of this Commonwealth. In 1956 (in the case of *Hallmark Productions, Inc. v. Carroll,* 384 Pa. 348), this Court dismantled the siege guns of the Motion Picture Censorship Act of 1915 which for 41 years had stopped those invading forces at Pennsylvania's borders. Now, there is nothing left with which to save clean-minded, clean-thinking men, women and children of this State from the vulgarities, obscenities and indecencies which some moving picture producers are determined to inflict on the public for the sake of a greed-soaked dollar.

At the time of the oral argument in the *Hallmark* case, I asked from the bench what was to happen to the good people who revolt at dirt and filth mixed in with motion picture entertainment, if there was to be no Censorship Board to keep the screen clean. Two or three members of the Court, including the Chief Justice, as it was constituted at the time, replied that whatever apprehensions I might entertain in that respect could be dismissed because if, minus a Censor

---

* In view of the majority's disposition of this case it is unnecessary to analyze all the language of the statute under which defendant was indicted or to discuss the alleged trial errors.

Board, an immoral picture was booked at a theatre, the District Attorney could proceed to confiscate the film and arrest its exhibitor under the existing Penal Code.

My colleagues also said that what this Court was striking down was not law enforcement against motion picture indecency, but pre-censorship. This oral assurance was carried from the bench into the official Opinion of this Court which was written by Chief Justice STERN, who said: "It need hardly be added that even if all pre-censorship of motion picture films were to be held invalid this would not in and of itself affect the right to suppress objectionable films if exhibited, or to punish their exhibitor."

I wrote a Dissenting Opinion in which I said: "After the decision of the Majority will have been handed down, those same shameful, shameless, degrading films may be projected anywhere in Pennsylvania publicly, the distributors and exhibitors being subject only, after showing, to the penalty provided under criminal law."

Although naturally disappointed with the Court's decision, I at least gained comfort in the realization that the purveyors of the shameful, degrading films would be subject, after the showing, to the penalty provided under criminal law.

But now, the Majority says, that the penalty is non-existent. And so the question naturally propounds itself: What has happened to the protection which this Court proclaimed as vividly as flag signals from a ship? The Act of June 24, 1939, P.L. 872, §528, under which the defendant in the case before us was indicted, tried and convicted, provides: "Whoever gives or participates in or being the owner of any premises, or having control thereof, permits within or on said premises, any dramatic, theatrical, operatic, or vaudeville exhibition, or the exhibition of fixed or moving pictures of a

lascivious, sacrilegious, obscene, indecent or immoral nature and character, or such as might tend to corrupt morals, is guilty of a misdemeanor."

The Supreme Court knew of this Act in 1956 when it pronounced its decision in the *Hallmark* case. It practically said that the people did not have to fear they would be deluged with obscenity in motion picture theatres, since The Penal Code would protect them from such obscenity. Now, only three years later, it announces that the protection which it proclaimed has no reality at all. The signals which were flown from the high masts turn out to be beguiling, the lifesavers which were thrown to the public in 1956 turn out to be weighted with lead, the lifeline which was lowered over the deck's rail has turned out to be only a thread which the decision of this Court today severs.

When this Court spoke in 1956 it knew of the Act of 1939 and, if it is unconstitutional in 1959, as the Court says today, it was certainly unconstitutional in 1956. Why did it not inform the people of Pennsylvania in 1956 that the Act of 1939 was only a delusion and a snare and incapable of protecting the people from the piratical attacks of indecency, pornography, and dirt?

This Court had a duty in 1956 to speak out on the reality of the law so that, if, as it states today, no existent law can protect the people from motion picture licentiousness, the Legislature could have supplied the desperate need for safeguarding public morals and public decency. Instead of speaking candidly, however, the Court threw to the public a weighted lifesaver, it lowered the parting strand of a lifeline, it hung out a chimerical rainbow, it flashed an unreliable weather report, it removed the warning signs from the rocky shores.

At the trial of the *Hallmark* case before the Court of Common Pleas, the attorney for the producers of the

involved motion picture, which carried the suggestive title of "She Should'a Said No", argued that censorship meant prior restraint, and that prior restraint was unconstitutional. The Trial Court wanted to know if there was no way of banning a motion picture which actually offended against public morals, whereupon the attorney for "She Should'a Said No," replied: "If it is shown, and it is sexually immoral, then the person showing the film may be brought in under the criminal laws."

And that is what this Court decided in the *Hallmark* case. It refused to ban "She Should'a Said No," or any other picture, but said that if a morally bad picture was shown publicly, the person showing the film could be prosecuted under the criminal laws.

Now it says there are no such criminal laws!

And what are the people to do for protection against an evil which no one can deny is as rampant today as it was in 1956?

The Pittsburgh Post-Gazette, as late as June 15, 1959, in speaking of motion picture censorship, said: "If Pennsylvania remained without one [a censorship board] it would still have the protection of its penal code which provides for the criminal prosecution of exhibitors of obscenity."

The editorial writer, of course, could not know that within the matter of two weeks the penal code punishing exhibitors of obscenity would be declared unconstitutional by this Court, even though other exhibitors of indecent, immoral and obscene pictures have been prosecuted under that same code for decades. It is particularly to be noted that the editorial writer, like everyone else in the State who read this Court's decision in the *Hallmark* case, felt that when this Court broke from the State's bow of protection the string of censorship, there would still remain the string of

criminal prosecution. It will be a sad day indeed when the entire State realizes that the bow, with its many strings, which for so long safeguarded its citizens from visual and auditory assault on their sense of decency has now been stripped of all its strings and is as useless as a stick against an attacking jackal.

Only recently Governor David L. Lawrence issued extradition warrants for seven members of a West Coast ring accused of mailing lewd material to Philadelphia school children, housewives, and businessmen. Under this Court's decision, the extradition will be in vain, insofar as it applies to those accused of sending pornographic motion pictures into Philadelphia.

What is the present case about? In December, 1956 and January, 1957, the Court of Quarter Sessions of Lackawanna County heard evidence concerning an alleged indecent motion picture entitled "Undercover Girls." This picture was exhibited at a public theatre. People paid admission to see it. Three members of the State Police saw it and reported to the District Attorney. The District Attorney, undoubtedly assured by the *Hallmark* decision, initiated prosecution against Martin Blumenstein, the exhibitor of "Undercover Girls" under the criminal laws of Pennsylvania, specifically the Act of 1939. Blumenstein was indicted and, at his trial, he agreed to have the case heard by a judge without a jury. The Judge viewed two reels of the motion picture and, after hearing all the evidence, concluded that: "The pictures depicted a series of dancing acts, which were definitely cheap, lewd, obscene and indecent. By their very nature they would corrupt the morals of the immature and the weak, appealing only to those of depraved taste and the lowest of human instincts. To seek and entice dollars through the promotion of lust and immorality manifests the worst kind of greed of money."

The Court found the defendant guilty as indicted and imposed a sentence of $200 fine and imprisonment of three months. The defendant appealed to the Superior Court, which in an excellent opinion by Judge WRIGHT, affirmed the conviction. This Court allowed an allocatur and now this Court reverses the conviction and discharges the defendant.

It is not necessary to stress the accepted law that the findings of a judge sitting without a jury bear the same weight as the verdict of a jury.[1] As already noted, the Trial Judge declared the film "Undercover Girls" to be "cheap, lewd, obscene and indecent." He said also that it promoted "lust and immorality."

Mrs. Edna R. Carroll, who for 16 years was chairman of the Motion Picture Censor Board, testified that the film included "strip dances in extreme nudity and obscenities and indecencies in dialogue." She said further: "Extreme nudity does not in any way indicate fully how we felt about this picture, because when you have extreme nudity in conjunction with indecent and obscene actions, such as there are in these dances, then you have something which is more than just nudity. We felt that the picture was lewd and obscene and that it was, therefore, rejected."

The general lewdness and smuttiness of "Undercover Girls" is emphasized by Mrs. Carroll's further statement, even though the lower Court regarded it as a conclusion, that the Board of Censors eliminated from the film that portion "where the performers removed their clothes for the purpose of inciting lust and obscenity." (When the picture was exhibited by the defendant, it was shown in its uncut version.)

Mrs. Carroll was not the only person who viewed the picture and found it to be indecent, obscene and

---

[1] *Com. v. Lick*, 146 Pa. Superior Ct. 435.

immoral. Corporal Roger L. Spence of the State Police, who has been with that splendid and superb organization for 22 years, testified that he witnessed the picture at a public theatre operated by the defendant and it was upon what he saw and heard himself that he arrested the defendant and charged him with violating the statute of 1939. At the trial he presented several of the children who were in the theatre the night he was there. Among them were two boys of 19 and 17 years of age, and three girls of 16, 15, and 12 years, respectively.

Corporal Spence testified that he received many complaints in the neighborhood because of the nature of the motion pictures exhibited by the defendant. He enumerated some of their titles, namely, "Blondes for Sale," "Bare Facts," "Naughty Paris Nights," "Rage of Burlesque," "Love Life of a Gorilla" with the subtitle "An Expose of Strange Jungle Life," and "Children of the Sun," carrying the subtitle "Sensational Story Filmed in French Nudist Camp."

There can be no doubt that, in exhibiting "Undercover Girls", Martin Blumenstein violated Section 528 of the Act of 1939. The lower Court properly said: "The statute under which the defendant stands charged, definitely seeks to prevent the public exhibition of motion films which are 'obscene' and which 'tend to corrupt public morals.' While that which is to be classified as 'obscene' is not specifically defined, we think the language and intent is sufficiently clear and definite. Certainly, what is meant by the words 'obscene and tending to corrupt public morals' is not hard to understand." This statement specifically demonstrates that the Judge found the defendant guilty because the film was obscene and tended to corrupt public morals, which is the language of the Act.

The Majority of this Court does not challenge the

lower Court's findings; it does not say that Martin Blumenstein was not exhibiting an obscene picture, which the fact-finding tribunal declared it to be. It merely contents itself with saying that Section 528 is unconstitutional. It makes no effort to show why it is unconstitutional. I believe that the people of Pennsylvania who expect protection from obscene exhibitions, and who had every reason to assume that it had that protection in The Penal Code, are entitled to be told why this Court strikes down a law, whose prostrate form now leaves the district attorneys of the Commonwealth helpless to fight the purveyors of cinematic filth.

The Majority does not seem to realize the seriousness of declaring an Act of the General Assembly unconstitutional. It has ordered the execution in a very casual and almost haphazard fashion. It cites no cases which compel this Court to ignore the specific mandate of our Legislature which says that when there is doubt about constitutionality, such doubt is to be resolved in favor of upholding the statute. (Act of May 28, 1937, P. L. 1019, Art. 4, §52).

In *Swartley v. Harris*, 351 Pa. 116, 119, this Court said: "The language of a statute must be read in a sense which harmonizes with the subject matter and its general purpose and object. The general design and purpose of the law is to be kept in view and the statute given a fair and reasonable construction with a view to effecting its purpose and object."

What is the purpose and object of the Act of 1939? Can there be any doubt that its purpose is to protect the Commonwealth from exhibitions which will debauch the public mind, corrupt the public morals, and offend against public decency? But this Court, instead of trying to find a logical way in which to uphold the statute, simply cites a few cases at random, many of

which are not binding on this Court[2] and others which are antiquated in the light of later decisions.[3] The Majority Opinion does address a sentence or two, apparently wearily, to the word "obscene," which, of course, is a crucial word in the case. This is how the Majority Opinion languidly disposes of the matter: "This leaves the single term 'obscene' to consider. It was held unconstitutional, per curiam, citing Burstyn and Superior Films, in Holmby Productions, Inc. v. Vaughn, 350 U.S. 870, 76 S. Ct. 117 (1955), a motion picture case."

*What* was held unconstitutional? May a word be declared unconstitutional?

The decision in the case of *Holmby Productions,* which the Majority Opinion cites with hand-waving finality, offers very little to support the Majority's position. I will copy out the *whole* decision in the United States Reports. This is what one finds on page 870 of 350 U.S.: "No. 338 Holmby Productions, Inc. et al. v. Vaughn et al., constituting the Kansas State Board of Review, et al. Appeal from the Supreme Court of Kansas. Per Curiam: Judgment reversed. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495; Superior Films, Inc. v. Department of Education, 346 U.S. 587. James C. Wilson for appellants. Harold B. Fatzer, Attorney General of Kansas, and Paul E. Wilson, Assistant Attorney General, for appellees. Reported below: 177 Kan. 728, 282 P. 2d 412." Can one gather from that skeletonized expression that Section 528 of the Act of 1939 of the Pennsylvania Legislature is unconstitutional? Can any one gather from it that the word "obscene" is unconstitutional?

---

[2] *U. S. v. Clarke,* D.C. 38 F. 732 (1889); *U. S. v. Davidson,* D.C. 244 F. 523 (1917).

[3] *Swearingen v. U. S.,* 161 U.S. 446 (1896); *U. S. v. Ulysses,* 72 F. 2d 705 (1934).

The Majority Opinion, which is written almost in telegraphic code, apparently wants to say that the word "obscene" is vague. If that be the intent of the Majority Opinion, I can only say that the word "obscene" today is about as vague as the word "cat." I doubt that there is a newspaper reader, radio listener, or television watcher, no matter how meager his education or how much a stranger to books, who does not know the meaning of the word "obscene." Why the Majority should pretend mystery over so well-known and so generally used a word is a mystery in itself.

The Majority well knows that it is the jury which passes upon the quantum of proof in any given case, and it is the jury which will decide whether certain pictures are obscene or not. And one may quite well be assured that if twelve unrelated people, drawn from every walk of life, conclude, after viewing a motion picture, that it is obscene, it truly is obscene and should not be released to audiences.

About the only case which the Majority Opinion cites which is directly relevant and controlling is the one of *Roth v. United States,* 354 U.S. 476; and a reading of that decision will show that it establishes the very contrary of what the Majority apparently thinks it decides. This case involved two convictions, one (Roth) coming up from the Lower District of New York (affirmed by the 2nd Circuit Court of Appeals,) and the other (Alberts) reaching the Supreme Court from the State of California. Roth was convicted of violating a Federal statute which makes punishable the mailing of material that is "obscene, lewd, lascivious, or filthy or other publication of an indecent character." Alberts was convicted under a California statute which makes punishable, inter alia, the keeping for sale or advertising material that is "obscene or indecent."

At the *Roth* trial, the Judge instructed the jury: "The words 'obscene, lewd and lascivious' as used in

the law, signify that form of immorality which has relation to sexual impurity and has a tendency to excite lustful thoughts."

At the *Alberts* trial, the Judge instructed the jury that the test was whether the material involved had a "substantial tendency to deprave or corrupt its readers by inciting lascivious thoughts or arousing lustful desires." The defendants respectively argued that these instructions were improper and violated constitutional guarantees. The Supreme Court said: "In light of our holding that obscenity is not protected speech, the complete answer to this argument is in the holding of this Court in Beauharnais v. Illinois, supra, at 266: 'Libelous utterances not being within the area of constitutionally protected speech, it is unnecessary, either for us or for the State courts, to consider the issues behind the phrase "clear and present danger." Certainly no one would contend that obscene speech, for example may be punished only upon a showing of such circumstances.' "

At the *Roth* trial the Judge charged: "In this case, ladies and gentlemen of the jury, you and you alone are the exclusive judges of what the common conscience of the community is, and in determining that conscience you are to consider the community as a whole, young and old, educated and uneducated, the religious and the irreligious—men, women and children." The Supreme Court held that this instruction was unobjectionable.

It was argued in behalf of Roth and Alberts that the words "obscene," "lewd", "lascivious," "filthy", "obscene" and "indecent" were not sufficiently precise, but the Supreme Court declared: "Many decisions have recognized that these terms of obscenity statutes are not precise. This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. '. . . [T]he *Constitution*

*does not require impossible standards;* all that is required is that the language "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. . ." ' These words, applied according to the proper standards for judging obscenity, already discussed, give adequate warning of the conduct proscribed and mark 'boundaries sufficiently distinct for judges and juries fairly to administer the law.' " *

Summarizing its observations on the statutes involved, the Supreme Court said: "In summary, then, we hold that these statutes, *applied according to the proper standard for judging obscenity, do not offend constitutional safeguards against convictions* based upon protected material, or fail to give men in acting adequate notice of what is prohibited."

In view of this very clear language and everything else which the Supreme Court said in the *Roth* case, it completely escapes me how the Majority arrives at the conclusion that the *Roth* case supports the proposition that Section 528 must die on the guillotine of unconstitutionality.

The Supreme Court of Illinois spoke a great deal of common sense in the case of *Block v. City of Chicago,* 239 Ill. 251, 263 : "There are the shameless and unclean, to whom nothing is defilement, and from whose point of view no picture would be considered immoral or obscene. Perhaps others could be found, with no laxity of morals, who pay homage to art and would not regard anything as indelicate or indecent which had artistic merit, and would look upon any person entertaining different sentiments as of inferior intelligence, without proper training on the subject, and blinded with bigotry. Both classes are exceptional, and *the average person of healthy and wholesome mind knows well enough*

---

* Italics throughout, mine.

*what the words 'immoral' and 'obscene' mean and can intelligently apply the test to any picture presented to him."* On the same scene, the Court of Appeals of New York said in *People v. Muller*, 96 N. Y. 408-10: "They are words in common use, and every person of ordinary intelligence understands their meaning, and readily and in most cases accurately applies them to any object or thing brought to his attention which involves a judgment as to the quality indicated. *It does not require an expert in art or literature to determine whether a picture is obscene or whether printed words are offensive to decency and good morals."*

I must repeat that the Majority does not seem to realize what a serious thing it is to kill a statute enacted by the General Assembly, the sovereign power of the Commonwealth. The Majority completely ignores that this Court has said many times that "all legislation must be construed as intending to favor the public interest." (*Com. v. Sunbury School District*, 335 Pa. 6, 12.) In *Com. ex rel. Shumaker v. N. Y. & Pa. Co.*, 367 Pa. 40, 53, we said: "In construing the legislative intent the Statutory Construction Act of May 28, 1937 . . . directs us to presume the intention of the legislature to be that it intends to favor the public as against any private interest."

May this Court not presume that it is the intention of the Legislature to favor the public which certainly wishes to see young girls of 16, 15, and 12 protected from the degradation of visual and auditory contact with an immoral picture such as "Undercover Girls" has been proven to be? Who can doubt that many juvenile delinquents have been consciously or unconsciously urged into lurid crime because of being repeatedly exposed to lurid and immoral motion pictures? Children are by nature imitative and when they see

immorality being practiced on so extensive and expansive a medium of expression as the motion picture screen, is it strange if they conclude that there is nothing wrong about doing what is being publicly glorified?

The filth and degeneracy which runs over the screens of many motion picture theatres today is nothing less than appalling. The *Saturday Review* said of the highly profitable and notorious film entitled "Baby Doll" that it was "one of the most unhealthy and amoral pictures ever made in this country." *Time Magazine* spoke of it as "just possibly the dirtiest American-made motion picture that has ever been legally exhibited."[4] After this Court knocked out our Motion Picture Censor Board there was no way of keeping this monstrously ugly and degenerate film from the theatres in Pennsylvania and, of course, now that this Court, with today's decision, has destroyed the only remaining protection we have had from cinema monstrosities, there can be no doubt that there will come along other film depravities which will make "Baby Doll" seem like a Sunday School travelogue in comparison.

In *Commonwealth v. Mason,* 381 Pa. 309, 312, this Court said: "Penal statutes must be strictly construed . . . but that does not require us to hold that the words of a criminal statute must be given their narrowest meaning or that the lawmaker's evident intent must be disregarded."

Can there be any doubt about the lawmaker's intent in the Act of 1939? Ever since the dawn of civilization, society has been fighting debauchery, lechery, and immoral display. Even without statutes on the subject, the exhibition of a picture which outrages public de-

---

[4] Cited from a series of articles by the eminent author Howard Whitman published in Pittsburgh Post-Gazette July 4 to 17, 1958.

cency is a crime. "It may, therefore, be laid down as a general rule . . . that any act which has a direct tendency to corrupt the public morals, or which tends to shock the public sense of morality and decency, is a misdemeanor, whether covered by any statute or not." Clark and Marshall, Law of Crimes, vol. 2, par. 458, quoted with approval in *Com. v. Schoen*, 25 Pa. Superior Ct. 211, 217.

Judge ERVIN of the Superior Court spoke wisely, courageously and eloquently on this subject in the case of *Commonwealth v. Randall and Wofsy*, 183 Pa. Superior Ct. 603: "Our Federal and State Constitutions assume that the moral code which is part of God's order in this world, exists as the substance of society. The people of this State have acted through their legislature on that assumption. We have not so cast ourselves adrift from that code nor are we so far gone in cynicism that the word 'immoral' has no meaning for us. *Our duty, as a Court, is to uphold and enforce the laws, not seek reasons for destroying them.*"

In that case the Court was considering the Act of June 3, 1953, P. L. 277, which reads: "Whoever, being of the age of twenty-one years and upwards, by any act corrupts or tends to corrupt the morals of any child under the age of eighteen years . . . is guilty of a misdemeanor." The defendant there contended that the words of the statute were vague. Judge ERVIN well said that the words "certainly convey concrete impressions to the ordinary person. The common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it."

Although the defendant here was indicted under the Act of 1939, it must not be assumed that it was not

until 1939 that the Legislature addressed itself to so well-known a subject as the need to protect the public from lewd, obscene and immoral behavior. The Act of 1939 is a consolidation of the Act of 1911, Apr. 13, P. L. 64, and the Act of 1860, Mar. 31, P. L. 382. The Act of 1911 contains the same inhibitive language as that contained in the Act of 1939, and the Act of 1860 is limited in its scope only because there were no motion pictures in 1860. However, even before 1860, offenses against public morality and decency were punished at common law. Thus, to strike down Sec. 528 of the Act of 1939 means to strike down a prohibition which has been the law of Pennsylvania for centuries.

There is not a single word in the whole Majority Opinion which suggests even remotely that it is at all concerned about the evil aimed at by the Legislature in 1939, 1911 and 1860 and which the Common Law punished as far back as "the memory of man runneth not to the contrary."

There is not the slightest suggestion in the Majority Opinion that the Majority is at all concerned about the menace which obscenity, no matter in what form, presents to the Commonwealth of Pennsylvania, its people, and mankind in general. The conviction of Martin Blumenstein, who was unquestionably guilty of the crime with which he was charged, could have been sustained under the Common Law, if not under the Act of 1939.

In the case of *Commonwealth v. Sharpless and others*, 2 S. & R., 91, the defendants were indicted for having exhibited "a certain lewd, wicked, scandalous, infamous and obscene painting." The indictment in that case ended, as it does in this case, with the words: "And against the peace and dignity of the Commonwealth of Pennsylvania." After a verdict of guilty had been entered against them the defendants moved for

arrest of judgment on the ground, inter alia, that, "however reprehensible the conduct of the defendants may have been, in a moral point of view, and however richly they may have merited the censures of society, they have done nothing to expose themselves to the penalties of the law." This Court overruled the motion and ordered that judgment be entered on the verdict of guilty. In affirming the conviction, Justice YEATES said: "The destruction of morality renders the power of the government invalid, for government is no more than public order; it weakens the bands by which society is kept together. The corruption of the public mind, in general, and debauching the manners of youth, in particular, by lewd and obscene pictures exhibited to view, must necessarily be attended with the most injurious consequences, and in such instances, courts of justice are, or ought to be, the schools of morals . . . The question, then, in this part of the case is narrowed to a single point: whether the exhibition of a lewd, wicked, scandalous, infamous, and obscene painting, representing, etc., to certain individuals, in a private house, for money, is dispunishable by the sound principles of common law? On this question I cannot hesitate . . . No man is permitted to corrupt the morals of the people; secret poison cannot be thus disseminated."

J. Edgar Hoover, Director of the Federal Bureau of Investigation, said not long ago: "As a law enforcement officer and as an American citizen, I feel duty-bound to speak out against a dangerous trend which is manifesting itself in the field of *film* and television entertainment.

"In the face of the nation's terrifying juvenile crime wave, we are threatened with a flood of *movies* and television presentations which flout indecency and applaud lawlessness. Not since the days when thousands filed past the bier of the infamous John Dillinger

and made his home a virtual shrine have we witnessed such a brazen affront to our national conscience."

Postmaster General Arthur Summerfield recently made a special appeal to the American public to get "obscene materials" out of the mails. The *Philadelphia Bulletin,* reporting on his testimony before a Congressional Committee, said: "He told a special congressional hearing, called by Representative Granahan (D-Phila), that traffic in this material has increased greatly in recent years due to *liberal decisions by the courts.* He also told the hearing . . . that the amount of filthy and pornographic materials moving through the mails 'is measured in tons.' 'In our efforts to halt this traffic,' Summerfield said, 'we have been subjected to attack and ridicule by those who profit personally from unrestricted mailing, and by those *who confuse liberty with license* and unwittingly give these dealers in filth assistance.' "

The *Newsweek Magazine* for April 27, 1959, carried the following item: "Every day in the year the mailman unwittingly drops in the letter box of some American home a lurid circular offering smut for sale. Mail-order-vice—the wholesale distribution of *pornographic films,* photos and books—is a $500 million-a-year racket. But even worse, it is now being directed at the nation's youth—the impressionable teen-ager . . . Postal authorities say they are trying, but that there are legal handicaps. Most of the dozen or so biggest operators of smut factories have shrewdly based themselves in Los Angeles or New York, two cities where *the courts have tended to take a broad view of obscenity.*"

After the decision of this Court is handed down, will the big cities of Pennsylvania be added to the list of the cities where traffic in obscene films will flourish because of the broad view of obscenity taken by its Supreme Court?

The *Philadelphia Inquirer,* less than a month ago, appealed in an editorial to parents to assist the public authorities in combatting obscene literature. The editorial said: "The war against printed filth distributed to young people by mail and newsstands can be fought on many fronts, but the most effective battle line is in the home." But how can parents do anything if laws intended to protect the American home from printed and cinematographic obscenity are destroyed in the Courts?

Cardinal Richard Cushing of Boston said a few days ago that the problem of obscenity is not new: "In every civilized community, including our own, there have always been laws restricting the publication and distribution of literature which could serve no other purpose than to arouse indecent imaginations and stimulate lascivious desires. What is new and distressing is the effort which is being made in some quarters to minimize the dangers which arise in the prevalence of obscene literature and to impede the application of existing laws by raising questions concerning their precise meaning and the definition of their terms."

Although in the case at bar we are concerned more with obscenity in films than obscenity in books, the resulting problem is always the same. So far as the Legislature is concerned, it aims at striking at obscenity, no matter in what form projected. Moreover, motion pictures today are in effect talking pictorial books. In fact, most of the successful motion pictures are based on books. Thus, whether youth is corrupted by reading salacious books or by looking at salacious motion pictures, the deleterious effect on the fibre of the nation is the same. Cardinal Cushing said further, and with undeniable truism, that: "The survival of our nation depends upon the moral integrity of those who are being trained for tomorrow's social responsibilities."

Who can deny that the Legislature had this very thing in mind when it enacted the Act here under consideration? In construing the Anti-Narcotics Act of July 11, 1917, P. L. 758, the Superior Court said: "While penal laws are to be strictly construed . . . common sense and evident statutory purpose are not to be overridden."

The common sense of the Act of 1939 is so obvious that one can only wonder why this Court makes such a problem of it.

Who, with a thought for all that is sensitive and delicate, and who, with an appreciation for the dignity and nobility of life, can deny that the vulgarization of the human relationship between man and woman, as often depicted on the screen, is painfully offensive to those who respect and cherish the beautiful and tender aspects of love and sentiment? Judge LEWIS, President Judge of Court of Common Pleas No. 2 of Philadelphia County, who sat on the *Hallmark* case at the trial level, was during the trial, moved to this impassioned but understanding outburst: "About one third of those [motion pictures] I see lead me to want to exile to a desert island all those who have anything to do with the production—about one-third . . . Suppose you were a god, if you can think of such a thing . . . wouldn't you be very disgusted with us, and particularly with those who produce the average motion picture? What is their object, to traffic in the lowest impulses of human beings? The most animal traits of a human being are pandered to by the motion pictures."

While, of course, the law cannot regulate all matters of customs, mores, and taste, the people have the right to expect that their representatives in the Legislature will protect them from what offends against public decency and good morals. Judge LEWIS said on this subject: "If you tell me that the people of the United

States haven't got any right by suitable legislation to protect their children against the kind of things that television and the moving pictures are forcing on their children, I will say that you are talking absurdity. There are certain inherent rights in parents to protect their children. The community is only a group of parents."

The Legislature of Pennsylvania did legislate to protect the children of Pennsylvania. It began in 1860, as I have already indicated, and it reinforced that determination in 1911 and in 1939. But, even prior to that, the Common Law threw its mantle of protection over children and humanity in general against the evils which Judge Lewis so ardently and justly condemned in 1954.

A brief filed, as amicus curiae, by the American Civil Liberties Union, argues that the Act of 1939 violates the First and Fourteenth Amendments of the Constitution of the United States. The Supreme Court of the United States specifically declared in *Roth v. United States*, supra, that "obscenity is not expression protected by the First Amendment." And it is obvious that it is not protected by the Fourteenth Amendment.

The brief quotes at length from the opinion by Judge FRANK filed in the Court, whose decision was reversed by the Supreme Court. But even Judge FRANK, whose views were not accepted by the Supreme Court, did say that "Government should be concerned with anti-social conduct, not with utterances." In this case we are not concerned with speech or any statement made by the defendant, Martin Blumenstein. It is anti-social conduct which is the subject of the indictment brought against him, and that indictment was based on a statute which, it cannot be denied, the Legislature of Pennsylvania had the right to enact. The First and Fourteenth Amendments guarantee to every American citi-

zen the right of free speech and due process of law, but they do not guarantee to him the right to injure others.

The American Civil Liberties Union characterizes as suppression and censorship many acts of government which are necessary for the citizen's well-being and for safeguarding his physical and moral health. The word censorship is regarded with abhorrence and yet there is scarcely a field of activity in modern day civilization in which the government does not predetermine whether the citizen shall be allowed to consume the article which he has the right to purchase. The government inspects food in order to assure the citizen it is free from infectious and contaminative substances; the government inspects medicines and pills to save the citizen from poisoning; the government inspects water to filter out impurities; the government compels inspection of automobiles to save the citizen from faulty brakes or defective lights. The citizen accepts this type of regulation because it helps him to ward off disease, accident, and death. Why should he object to regulation which will preserve his moral health?

The fact of the matter is that the average citizen does not object to motion picture censorship and certainly not to punishment of purveyors of obscenity. On the contrary, he welcomes a regulation which saves him from much of the nausea which passes as entertainment. The one who really protests government supervision of the kind under discussion is the one who makes a business of dealing in media which endangers health. Many who shout for unrestrained exploitation of obscenity shout within the mask of so-called artistic freedom. The commercialized exploiter of cheap, unartistic material can often be found concealed behind a shield of art. He cries for freedom while, as the New York Joint Legislative Committee on Obscene Publica-

tions expressed it, "he openly continues to pander to the lewd and lascivious, seeking only to sensationalize and exploit sex, immorality and perversion for profit."[5]

The American Civil Liberties Union brief, quoting from the Government brief in the case of *Roth v. U. S.*, 354 U. S. 476, describes motion pictures of pornography, sexual orgies and excesses which are incredibly foul. From time to time one reads in the newspapers of the seizing of this hideous erotic material and the arrest of their purveyors. What is to happen now? The merchants and exhibitors of this vileness will probably be arrested by conscientious district attorneys and they will then be freed by a committing magistrate because of a decision of this Court which laconically intimates that the word "obscene" is vague.

There was a time when juries and trial judges conscientiously performing their duty in ascertaining the facts were allowed to use their common sense and appreciation of what is fair and just in deciding what is obscene and what is not obscene. That day is vanishing like the American Indian because recently courts have been fighting windmills over the definition of the simplest words. Any urchin on the street, any illiterate immigrant only in America a few months, any uneducated laborer will tell you the meaning of the word obscene, but there are courts which still cannot define or describe obscenity without employing polysyllabic words enmeshed in complicated verbiage of unending modifications and nuances which finally leave the reader or hearer as confused as one listening to an aboriginal incantation in an equatorial jungle.

The Majority of this Court declares Section 528 of the Act of 1939 unconstitutional. Why? One would have reason to expect that in a decision striking down

---

[5] Op. cit., Howard Whitman, Post-Gazette July 7, 1958.

a solemn act of the Legislature, one would find language which, if it did not overawe and overwhelm with its massive proofs and irresistible logic, would at least satisfactorily convince the reader of the imperative need of taking to the chopping block, no matter with what anguish of mind and soul, a creature of the sovereign body of the State. But one does not find such language in the Majority Opinion. One finds three legal size sheets of cryptic utterances, studded with digits and names of cases, none of which, as I have shown, impel this Court to the tragedy of executing a long respected and long-serving statute of the Commonwealth.

So that I may not appear to be unfair with this seemingly harsh observation, I will quote the words the Majority employs in laying to rest for all time the body of Section 528 of the Act of 1939. The Majority Opinion says: "In this posture of the law our conclusion in *Hallmark* is dispositive:". I assume that the Majority intends to say here that a quotation from the *Hallmark* decision, which is to follow, disposes of Section 528 completely, finally and irrevocably. I quote from the Majority Opinion as it quotes from *Hallmark*: "The picture involved in the present case was disapproved by the Board of Censors because it was 'indecent and immoral and, in the judgment of the Board, tended to debase and corrupt morals'. In view of the foregoing decisions of the Supreme Court [not including Roth & Alberts, which was written later], individually and collectively, we are of opinion that these terms must be held subject to the same fatal objections as those which invalidated the statutes held unconstitutional by the Court."

It will be noted that the "dispositive" quotation says nothing about the "obscene." It will be noted that the dispositive quotation says nothing about The Penal Code. It will be noted also, if one looks at the first page of the Majority Opinion that *Hallmark* also said: "It

need hardly be added that even if all precensorship of motion picture films were to be held invalid this would not in and of itself affect the right to suppress objectionable films if exhibited, or to punish their exhibitor."

Thus, *Hallmark* is *not* dispositive of Section 528 of The Penal Code. On the contrary *Hallmark* says that The Penal Code *is alive and effective.* In fact, on the second page of the Majority Opinion we find the statement that the indictment in this case "was brought under the statute" of 1939, which is the very statute which *Hallmark* says is alive. How then can *Hallmark* kill off Section 528 when the Majority Opinion itself quotes *Hallmark* as saying that Section 528 is alive?.

Moreover, it will be noted that the Majority Opinion has bracketed within the quoted paragraph from *Hallmark* the phrase "not including *Roth & Alberts,* which was written later." Since *Roth & Alberts* followed *Hallmark* then this Court is bound by *Roth & Alberts,* is it not? And what does *Roth & Alberts* say: It says that the word "obscenity" does not fail to give the public "adequate notice of what is prohibited."

Upon what, then, does the Majority stand in striking down Section 528? It stands on a platform of enigma and ambiguity, aiming at a target with more will than reason, and then, failing to pierce the objective with logic and precedent, it proceeds with sheer arbitrariness of power to end the career of a statute which has been the champion of decency, the guardian of youth and the upholder of public morals.

### Addendum

I doubt that members of the Legislature have the time to read all the opinions of this Court, but I hope that they will read the decision of the court in this case, so that they may immediately prepare legislation to re-

store a few weapons into the armory of law enforcement on the subject of lewd and obscene motion pictures. The Commonwealth has now been stripped of all authority to protect the children of our State from the flood of pornographic films held back at the borders by the dikes of the Act of 1939, Section 528, which have today been razed.

I would respectfully suggest further that the Legislature might assign to an appropriate committee or committees the task of reading opinions of this Court as they are filed so that the General Assembly may be kept informed on what is happening to measures it enacts into law. Such committees might come to the conclusion that occasionally this Court misreads the Legislature's intentions. I believe that the Court misread the Legislature's intentions when it interpreted the Act of May 14, 1925, (see *Commonwealth v. Cleveland Thompson,* 389 Pa. 382) ; I believe this Court misinterpreted Section 701 of The Penal Code of 1939 on the subject of the so-called felony-murder doctrine (see *Commonwealth v. Bolish,* 381 Pa. 500 and 391 Pa. 550) ; and of course, I believe it has badly misread Section 528 of the Act of 1939.