## Harman v. PLCB

*Robert Claravel*, for appellant.
*Guy J. DePasquale*, for respondent.

DOWLING, *J.*, April 30, 1986 — Does simulated[1] sex via the medium of television constitute entertainment of a lewd, immoral, and improper nature contrary to section 4-493 of the Liquor Code?[2] While this appears to be a novel question, it has sad overtones of modern life where so many things are experienced vicariously through the "tube." The Walter Mittys of the world need not tax their imagination, but can pop in front of the box and be titillated by "soaps," excited by a sporting event, thrilled by scenes of travel and adventure, and now, through the marvel of cable, experience the passion of sex.

The writer of this opinion was juvenile judge for some years and would have each child who was being sent to an institution complete a questionnaire.

1. *Simulate* is to assume the character of something else by imitating its appearance or outward signs. For example, trees hewn to simulate artillary pieces tracked into position along the ramparts. Webster's Dictionary.

2. Act of April 12, 1951. P.L. 90, Article IV, section 493. "It shall be unlawful . . . for any licensee, under any circumstances, to permit in any licensed premises, any lewd, immoral or improper entertainment. . . ."

One of the questions was, "What is your favorite sport?" Invariably, the answer was, "watching TV." That reminds one of the story of the middle-aged man who had a heart problem and was told by his physician that he would have to give up 50 percent of his sex life. He replied, "Which half? Thinking about it or talking about it?"

The appellants own an establishment in Middletown, Pa., known as the Railroad House where on the early morning of October 20, 1984, they were shown through Prism a movie identified as *The Long, Swift Sword of Siegfried*. It was projected on a large, 40-inch screen. The enforcement officer, who went to the premises as the result of a complaint, remained there about an hour during which time the movie was in progress. No fee was charged for the viewing, and according to the owner's testimony, the set was operated by remote control and easily accessible to patrons, of whom a dozen or so were present. While Mr. Harman does not recall turning on this particular channel, he was aware that it was being shown. The movie did not have a specific rating (i.e. PG, R or X) because it was a foreign film. The record is lacking as to the plot of the drama, although it can be assumed that it was not based on the Nibelung and kindred legends or their adaption by Richard Wagner in his famous *Ring Cycle*. The officer testified:

"This movie had an English-type setting where a white male carried a white female up the steps to a bedroom and proceeded to have intercourse with her. Later, three nude females joined the active partners and proceeded to perform many sexual acts."

It appeared that all of the sex acts were simulated, at least visually, and though the female breasts and

buttocks were exposed, neither male nor female genitalia could actually be seen.

It has been held that simulation by *live* performers of the sexual acts is within the prohibition: *PLCB v. Ronnie's Lounge Inc.*, 34 Pa. Commw. 213, 383 A.2d 544 (1978), held that dancers had performed in a lewd and immoral manner when they engaged in sexually explicit gyrations simulating sexual intercourse while on the stage. See also, *PLCB v. J.P.W.G. Inc.*, 88 Pa. Commw. 385, 489 A.2d 992 (1985). In an unreported opinion, *People's Pizza v. PLCB*, (no. 158 C.T. 1985) filed March 12, 1986, Judge Rodgers in a case where a female dancer simulated sexual intercourse during her performance, concluded this was sufficient to support a finding of lewd, immoral or improper conduct.

The seminal[3] case appears to be *Tahiti Bar Inc. Liquor License Case*, 395 Pa. 355, 150 A.2d 112 (1959). In dismissing the licensee's appeal, the court found that where entertainers remove substantially all of their apparel and utilize during the course of their performance "bumps and grinds" by moving the lower part of their body backwards and forwards in both the fast and slow motion, such entertainment violated section 493 of the Liquor Code. See also *PLCB v. Taylor*, 96 Dauphin Rep. 218 (1974).

It must be remembered as emphasized in the decisions that we are not concerned with any particular test of obscenity as laid down by the various cases from the U.S. Supreme Court where the issues involved was usually freedom of speech or expression. Here, we deal with a business which is subject to strict regulation and license, as Chief Justice Jones stated in *Tahiti Bar, supra:*

3. The word has two distinct meanings, either of which might be considered appropriate.

"A state may, and generally does, require a license conditioned upon compliance with certain specified general requirements and personal qualifications before it will authorize an individual to sell alcoholic beverages. The license so issued is not absolute, and may be terminated or suspended by a state even though it may have been valid when initially issued. *Mahoney v. Joseph Triner Corp.,* 304 U.S. 401, 58 S.Ct. 952; *Premier-Pabst Sales Co. v. Grosscup* 298 U.S. 226, 56 S.Ct. 754. Our present inquiry is directed toward determining whether or not a state in exercising this power is limited and restricted by the constitutional guarantee to each individual of his right to freedom of speech and expression.

"In view, of the historical background giving the state virtually an absolute control over the business of dispensing alcoholic beverages, the mere statement of the question compels a negative reply. An individual has no constitutional right to engage in the business of selling alcoholic beverages. The conduct of such a business is lawful only to the extent that it is made so by the Liquor Code. *Cavanaugh v. Gelder,* 364 Pa. 361, 72 A.2d 85 (1950), cert. denied. 340 U.S. 822; *Commonwealth v. Bienkowski,* 137 Pa. Super. 474, 9 A.2d 169 (1939). See *Crane v. Campbell, supra.* Section 493 does not purport per se to control, regulate, sanction or censor the type of entertainment an establishment may present to its patrons. Section 493 merely provides that, if a certain type of entertainment is presented, the privilege of dispensing alcoholic beverages, to which an individual has no constitutional right, will be withdrawn." *Tahih Bar, supra.*

An appeal was dismissed in a per curiam order by the U.S. Supreme Court, 361 U.S. 85 (1959).

478

The eminent jurist and dean, Burton R. Laub, set forth the rationale:

"Regulation of dealings in alcohol has been made necessary to protect the public from the potentially noxious effects of an inherently dangerous activity and not for the purpose of effecting general censorship. Because of the known effects of alcohol upon human beings, it is often necessary to proscribe acts and conduct in liquor establishments which might be innocuous elsewhere. For this reason general community standards cannot be used as the basis for a determination of what is or is not permissible in a licensed premises, for prurient interest, and dispositions for violence and disorder, are easily stimulated when alcohol is involved.

"It is significant that the legislature did not simply proscribe lewdness which, if synonymous with obscenity, would be condemned everywhere, but also forbade entertainment which is "immoral" or "improper." Thus, the law-making body recognized the built-in social hazards attendant upon off-color entertainment in a licensed establishment and sought to exclude that which might trigger noxious conduct of any sort, including matters of sex as well as of disorder and violence." *In matter of Revocation of Hotel Liquor License no. H-4222, etc.,* 45 Erie Leg. J. 371, 373-4 (1962).

See also *William Goldman Theaters Inc. v. Dana,* 405 Pa. 83, 173 A.2d 59 (1961); *Hallmark Productions Inc. v. Carroll,* 384 Pa. 348, 121 A.2d 584 (1956); *Commonwealth v. Blumenstein,* 396 Pa. 417, 153 A.2d 227 (1959); *Kingsley International Pictures Corporation v. Blanc,* 396 Pa. 448, 153 A.2d 243 (1959); *California v. Larue,* 409 U.S. 109 (1972); *Burton v. Horn & Hardart Baking Co.,* 371 Pa. 60, 88 A.2d 873 (1952).

Authoritatively analogous is the decision of the U.S. Supreme Court in *California et al. v. Larue et al.,* 409 U.S. 109 (1972), where the court considered regulations of the California Department of Alcoholic Beverage Control which prohibited, inter alis, performance of acts or *simulated acts* of sexual intercourse and other sexual activities *as well as the displaying of films depicting such acts.* The court, in upholding the regulation, held that in the context not of censoring dramatic performances but of licensing bars, defendant had broad constitutional latitude.

If our courts have proscribed live simulated sex acts, we fail to see how depicting such things on film or television makes a critical difference. The prurient interests of the audience can be aroused by moving pictures just as readily as by live performance; perhaps more so since the physical appearance of the media "stars" is apt to be beyond that which one normally finds in daily life. In the same vein, scantily clothed females or males can be just as titillating as live ones, although this may to some extent depend upon the underlying superstructure.

So with all due respect to "Siegfried's Sword," which as we all know from the opera house, is calling "Nothung" or needful,[4] we must thrust through the mask of celluloid and simulation and cut the defendant's appeal.[5]

Accordingly, we enter the following

---

4. In the great climax to Act I, Wagner's hero, after forging his sword, exclaims, "jetzt leuchtest du trotzig und hehr" (now leapest up dauntless and bright).

5. There was another issue which was not contested, i.e. the defendant's issuance of certain bad checks and the penalty imposed by the board took into account both violations.

## ORDER

And now, April 30, 1986, the appellant's appeal is dismissed, and the board's order of January 10, 1986, imposing the suspension of 25 days is affirmed.